# City of Lexington v. Jones et al.

March 6, 1942.

Robert M. O'dear for appellant.

J. A. Edge, J. J. McBrayer and George Vaughn for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

In the suit below appellant was defendant, and named appellee and one other, plaintiffs, who sued for the benefit of other persons similarly situated, a number of whom, 75 or more, came into the case by intervening petition. Original petition was filed in August 1936; intervening petitioners filed in November 1940, and judgment was rendered a year later. Why the delay is not shown.

Plaintiffs' properties lay outside and to the east of the city, in what is known as "Ashland Park," made up of several subdivisions, and at the time of the questioned ordinance there were a great number of residences in the

district, and it is conceded that the district is, and has been rapidly expanding. The parties complaining in the court below were residents before and at the time of passage; the sewage system leading from these residences had been constructed by the creators of the various subdivisions, so that when the houses were rented or sold they were provided with sewer pipes; these lead pipes were hooked into the general system, the city bringing its lines to the city limits, connections having been made at various times dating from 1910 to 1936.

It was stipulated upon submission that parties plaintiff purchased their properties prior to the adoption of the ordinance in question; that an exhibited map shows the places of residence of the petitioners, but does not show residences built and connected up since the map was made. The map shows the points where, and at what time eight or more connections were made with the city's system, carrying sewage to its disposal plant, which it appears is located to the west, some distance outside the city.

The situation as described, and about which there is no dispute, existed on May 20, 1935, the date of the adoption of the ordinance, the title of which describes it as prescribing fees for discharging sewage into the system of the city, to be paid for by owners or occupants of buildings and apartments outside the city limits; providing for issuance of permits to use the system on the payment of fees, and making it unlawful to suffer the discharge of sewage into the system without permit, and fixing a penalty. The preamble asserts that the city had expended large sums of money during the past forty years in erecting and maintaining the system and its disposal plant, all of which service residents beyond the city limits have been permitted to use, and for which, presumably, some have not paid. The preamble recited:

> "Whereas, in justice to the taxpayers of the city, who have stood and are standing the cost of maintenance of this system, a reasonable and fair charge should be made for this service which has been extended to those outside the city who do not pay city taxes on the property that is given service."

The Board then fixed a scale of fees to be charged the present owners or occupants who are using the system, and such as may later use it. This scale is gradu-

ated from $4.80 per year for a residence of three rooms to $9 per year for a ten-room residence, with $4.20 per year for each apartment in an apartment building. Pro rata payments were to be due in July after adoption of the ordinance; future payments to be made on January 1st of each subsequent year, upon notice from the city treasurer. Upon payment permit would be issued giving the holder the right for a stipulated period to "discharge sanitary sewage" into the system. The ordinance provided that it should be unlawful for the owner or occupant of any building or apartment, outside the limits to discharge sewage into the city system without the permit. A violation visited upon the violater a fine of from one to ten dollars, each day constituting a separate offense, the occupancy of the building being prima facie evidence of use.

In April 1936 the treasurer sent some of those outside the city who had used the system, accounts for the six months of 1935 and the year of 1936, which action apparently precipitated the suit which sought to have the court declare the ordinance void, on the ground that the city was without power to levy a tax on the property of, or persons who lived beyond the city limits. It also asked that the city be required to repay the tax or rental theretofore collected by the city. This last relief is not subject to discussion, because no proof was offered showing previous payments.

The matter was submitted to the commissioner for report; he took proof and made a detailed report which first set out the issues and such facts as were pertinent; reducing the question to one of law, he concluded that the ordinance was invalid because he found neither statute nor other authority, empowering a city of the second class to lay an assessment on property, or person outside the city, for benefits resulting from the maintenance of a sewage system, power not being delegated by the legislature; by requiring users to obtain a permit to use the system, and to suffer a fine for failure, was not only imposing upon them the assessment, or levy of a tax, but undertaking to punish for an offense, committed outside the jurisdiction of the city.

Counsel for appellant in brief agrees with the commissioner, and the chancellor who overruled appellant's exception to his report, in holding that "the city has no power to impose a tax upon property outside its cor-

porate limits.'' However, counsel disagrees with the second assumption that the ordinance attempts to impose a tax, it being argued that the ordinance merely fixes a charge to be paid by owner or occupant in the involved area for services rendered to them by carrying to the disposal plant, sewage deposited by them through their leads.

The commissioner found that there were no disputed facts to be determined. The court adopting the commissioner's views in his opinion, indicated that it was his belief that the parties outside the limits of the city had the right to contract for the use of its sewers, ''and if not made, the city may have the right to prevent them from the use of its system in an appropriate proceeding,'' but found these questions not before the court. There was a plea of estoppel, but plead in such a way that it related only to owners of properties who allege they relied on assurance of grantors that the properties were to be free of future charges. This would in nowise estop the city. The only allegation in this respect was the assertion that connections were made with the consent of the city.

Appellees argue that the charge made by the city to users of the system is a tax or an assessment; that a municipality is without power to levy taxes outside its territorial limits, unless specially authorized by statute. Since this conclusion is correctly admitted by appellant we shall not enter into a discussion, as we are of the opinion that the ordinance does not attempt to levy a tax upon, nor to assess or tax the property of, the district owners. We find the ordinance to be nothing more or less than a charge by the city against those who accept the tendered use of its facilities for their private convenience. There is presented no question of the power of the city to extend such use to the property owners adjacent to the city limits, Smith v. City of Raceland, 258 Ky. 671, 80 S. W. (2d) 827, and it seems to be agreed by parties that the city in establishing its system might at the time have contracted with the outside owners for the right to empty their sewage into its pipes and carry it to the disposal plant. If that be true, then in the absence of any bar by way of limitation or estoppel, the parties may now contract. In the absence of any showing to the contrary, the city might have at any time withdrawn its consent, which in effect it did by the less harsh method than that suggested, by disconnecting.

The effect of the ordinance was to withdraw use of the system and plant from those who, exercising their own will, choose not to continue; if they choose to continue, they should assist in meeting the expense of maintaining the system. The question as to whether the charges fixed were unreasonable, was not an issue before the court and is not discussed; but so long as they take advantage of the facilities of the city's property, the outsiders should pay reasonable charges, and some of the petitioners put themselves in the attitude of having paid, since they ask for recovery of money theretofore paid, an issue, if it was one, apparently abandoned on trial.

As to giving this use charge a technical name, such as tax, license or assessment, we find no necessity for endeavoring to do so. It might, under some authorities, be classified as a license or permit, but giving it the name, it is merely a charge for use and benefits for which those in the city have been and are paying by means not shown in the record. In the case of Postal Telegraph Cable Company v. City of Newport, 160 Ky. 244, 169 S. W. 700, 701, we were discussing the question of the right of a city, which had granted a franchise to the company for erecting its poles in its streets, imposing in addition a license of $100 per annum for use of the streets. While in this case the ordinance denominated the imposition as a "license tax," we found from a reading of the ordinance that:

"The compensation provided by the ordinance is not a license tax upon the right of the company to do business in the city, but is merely a charge against the company for the use of its streets;"

distinguishing the case from Cumberland Tel. & Tel. Co. v. City of Calhoun, 151 Ky. 241, 151 S. W. 659. We further said in speaking of the ordinance:

"It did not obligate the city to grant the use of its streets and public ways to the company for any specified period, or oblige the company to pay the stipulated compensation for any longer time than it chose to accept the rights granted by the ordinance."

So it is here that whatever right was granted to the users of its facilities, the city, in so far as the record shows, had the right of revocation, unless there was an

inviolable contract between the parties, which is not made to appear.

In the case of Cole v. Norborne Land Drainage Dist., 270 U. S. 45, 46 S. Ct. 196, 70 L. Ed. 463, 465, while the question was not exactly on all fours with the case here, the principles of equity and fair dealing are exemplified. There was presented the question of power of the drainage board to add to a theretofore legally erected district a large outlying benefited territory, without a referendum to the residents of the proposed new territory. The court found no arbitrary action in the respect on which injunctive relief was sought, and in laying down an equitable principle Mr. Justice Holmes for the court said:

"It seems strange if the power of the Legislature to add to a lawfully existing district depends on how that district was formed many years before. But it is enough to repeat the answer of the appellees. The original incorporators take the risk of a plan and agree to pay for it while as yet they do not know exactly what the plan will be or what the benefits. If after the plan is made and started it becomes obvious that other contiguous land will be benefited, it is just that such land should help to pay the bills. But only an Eighteenth Century faith in human nature could expect that the owners would vote to come in and pay their shares when they would get the same benefit if they stayed out."

As to power or authority to set in motion and give effect to the ordinance there is no doubt. The ordinance simply said to the owner, "If you choose to continue to use our plant you may elect to do so by paying the charge, and permit will be issued showing your election." We are pointed to no section of the Constitution or any statute which would prohibit the city from making such an offer, or declining service if the offer be not accepted, or in imposing a penalty, not for refusing to accept the offer but by continuing to trespass upon the city's property. It is fairly well established by text writers and opinions of courts that "the authorized body of a municipal corporation may bind itself by an ordinance which if in favor of private persons interested therein, may if so intended, operate as a contract." Dillon Municipal Corporation, 5th Ed., p. 1172. This principle is laid down in Re Petition of City of Philadelphia,

340 Pa. 17, 16 A. (2d) 32, 34. In that case there was a question not dissimilar to the one here. The court said:

"The right of the City of Philadelphia to receive such payments for the use of its sewer facilities was expressly recognized in Williams v. Samuel, supra, 332 Pa. [265], at page 271, 2 A. (2d) 834. These charges are not taxes, nor a substitute for taxes, but charges made, without discrimination, for an industrial service rendered in value equal to the respective sums charged; by using the facilities with knowledge of the rates charged, the consumer, by implication, contracts and agrees to pay the rates, and his obligation to make payment rests upon contract rather than upon any exercise of the taxing power."

We are concluded that so much of the ordinance as offers the use of its sewer facilities to those who live outside the city limits is valid, and as we read it there is nothing which savors of a denial of the due process of law, or denying the users the equal protection of the law. On the contention that under a certain section of the Constitution the city was without power to impose the penalty prescribed, because having no extra-territorial jurisdiction, we find little merit. The argument is not sustained by the Kentucky cases cited, Earle v. Latonia Agricultural Association, 127 Ky. 578, 106 S. W. 312, and Rieser v. Ward, 193 Ky. 368, 236 S. W. 255, in one of which we were dealing with conflicting jurisdiction, and in the other with a liquor selling offense committed outside the municipal territory.

The penalty here prescribed is not for failing to pay a charge for the use of the facilities, but penalizing the owners for discharging their sewage into the city's mains, without having a permit so to do. The offense is thus defined, and its commission constitutes a trespass upon the city's property. It may begin when the owner discharges the sewage from his own pipes, but it becomes a trespass when it reaches the main lines of the city, and so continues until it reaches the disposal plant.

Under Section 3058-5, Kentucky Statutes, the city is given the right to regulate by ordinance the use of culverts and sewers. Section 3058-23, Kentucky Statutes, gives the city general powers to impose, enforce and collect fines for the violation of any ordinance of the city.

Having expressed the views noted, we are of the opinion that the chancellor erred in holding the ordinance void. There was no prayer for injunction; the only question considered by the lower court and this court is, whether or not the ordinance is valid, and that is the sole question decided.

Judgment reversed with directions to set it aside, and enter one in conformity with this opinion.

The whole Court sitting.