CITY OF TEXARKANA, TEXAS, V. J. A. WIGGINS ET AL.

No. A-3273. Decided February 6, 1952.
Rehearing overruled March 26, 1952.
(246 S. W., 2d Series, 622.)

Justices Calvert, Smedley, Garwood and Griffin, dissenting.

*Norman C. Russell*, City Attorney of Texarkana, and *John D. Raffaelli*, of Texarkana, for Texarkana water and sewer systems, petitioners.

The City of Texarkana was under no obligations or legal duty to furnish water and sewer disposal services to non-residents of said city, and if they should elect to do so it may sell such services to non-residents under such terms an conditions as may appear to be to the best interests of said city, and it was error for the Court of Civil Appeals to hold that said city did not have the authority under Article 1108 (3) R.C.S. to provide the rates for water and sewer services in this case and made same applicable to non-resident citizens. Nalle v. City of Austin, 21 S.W. 375; City of Sweetwater v. Hamner, 259 S. W. 191; Atlantic Construction Co. v. City of Raleigh, 230 N.C. 365, 53 S.E. 2d 165.

*Brown and Brown*, of Texarkana, for respondents.

The City of Texarkana, having stepped out of its governmental functions and capacity, and engaged in a proprietary or corporate business, as a monoply—the water and sewer business —it became subject to the same laws, rules and regulations as private corporations and private individuals owning and operating public utilities as a monoply and must furnish services to all partons for the same price and on the same terms, under simi-

lar conditions. Dallas P. & L. Co. v. Carrington, 245 S.W. 1046, writ of error dismissed; Montgomery v. Greene, 180 Ala. 322, 60 So. 900; Bland v. City of Hearne, 95 S.W. 2d 979.

MR. JUSTICE SMITH delivered the opinion of the Court.

Respondents, all nonresidents of the City of Texarkana, Texas, filed this suit against Petitioner, the City, seeking to enjoin it in the operation of its municipally-owned water and sewer systems from charging nonresidents higher water and sewer rates than those paid by persons residing within the corporate limits of the city.

The trial court rendered judgment for Petitioner, the judgment reciting that the court heard sufficient evidence to determine the case on its merits. This judgment was reversed and the cause remanded by the Court of Civil Appeals. 239 S.W. 2d 212. The case is before us on writ of error.

Prior to August, 1948, the City of Texarkana, Texas, and surrounding territory, was served by the American Water Works, Inc., a privately-owned utility corporation. At that time the Petitioner purchased from this utility corporation all its property serving the city and surrounding territory, payment being made with proceeds derived from the sale of revenue bonds previously authorized by vote of the citizens of the city. An ordinance of the city, enacted on August 27, 1948, adopted for the municipally owned utility the schedule of rates theretofore charged by the American Water Works; this schedule of rates remained in effect until August 8, 1950. The system of rates charged by the American Water Works was, of course, nondiscriminatory in that both residents and nonresidents were charged the same rate for service.

On August 8, 1950, Petitioner passed an ordinance providing that water service to nonresident consumers would be furnished at one and one-half times the rate which applied within the corporate limits of the city. The ordinance further provided that sewer service to nonresident users would be furnished "at a rate double the rate applying within the city limits." A water tapping charge for all connections to the water system for residential use outside the city was fixed at $50.00; the water tapping charge for users within the city was set at $10.00 on unpaved streets, and $15.00 on paved streets.

Respondents are all residents of the City of North Texar-

kana, Texas, which adjoins the Petitioner on the north. The east-west streets in the City of Texarkana, Texas, are numbered consecutively, beginning with 1st Street in the business district of the City of Texarkana, Texas, and continuing to 36th Street in the City of North Texarkana. The line marking the corporate limits of the City of Texarkana, Texas, lies in the center of 29th Street. The north-south streets, which continue through both cities, bear the same names throughout their entire lengths. In short, the geographical line upon which the rate differentiation is based is an arbitrary line marking the limits of a political subdivision.

Petitioner contends that it is under no legal duty to furnish water and sewage disposal service to the Respondents; that if it does furnish such service to Respondents it is under no legal duty to charge the Respondents the same rate as is charged residents, but that it may make such charge as appears to be for the best interest of the City of Texarkana. This latter contention is based upon the provisions of Article 1108, section 3, R.C.S. of Texas, which provides:

"Any town or city in this State which has or may be chartered or organized under the general laws of Texas, or by special Act or charter, and which owns or operates waterworks, sewers, gas or electric lights, shall have the power and right:

\*　　\*　　\*　　\*

"3. To extend the lines of such systems outside of the limits of such towns or cities and to sell water, sewer, gas and electric light and power privileges or service to any person or corporation outside of the limits of such towns or cities, or permit them to connect therewith under contract with such town or city under such terms and conditions as may appear to be for the best interest of such town or city; provided that no electric lines shall, for the purposes stated in this section, be extended into the corporate limits of another incorporated town or city."

Respondents contend that the city in operating its water and sewer systems is acting in its proprietary capacity, that it is subject to the same rules and regulations as privately-owned utility corporations engaged in the same or similar business, and that the rates established by the ordinance of August 8, 1950, being discriminatory, are void and their collection should be enjoined.

We cannot agree with Petitioner's contention that this stat-

ute is sufficient to authorize it to charge a discriminatory rate for utilities furnished to nonresidents than to its residents. Under the facts in this case, the city has dealt with the residents and nonresidents as one class or unit. The ordinance under consideration recites that the city has purchased and is now maintaining and operating within and without the limits of said city a municipal water system. Since 1948 the same rates have been charged consumers living within and without the city. No other utility exists within the area to furnish water and sewer service.

1   The common-law   rule that one engaged in rendering a service affected with a public interest or, more strictly, what has come to be known as a utility service, may not discriminate in charges or service as between persons similarly situated is of such long standing and is so well recognized that it needs no citation of authority to support it. The economic nature of the enterprise which renders this type service is such that the courts have imposed upon it the duty to treat all alike unless there is some reasonable basis for a differentiation. Statutes have been enacted in almost every state making this common-law rule a statutory one. *Pond, Public Utilities,* (4th. ed. 1932) sections 270-275. Hence, the American Water Works was required to, and did, render service to Respondents at the same rate as was charged within the corporate limits of Petitioner.

It is settled in this state that the Petitioner, upon the purchase by it of the property of the privately-owned utility was subject to this same rule prohibiting unreasonable or unjustified discrimination in rates and service. *Galveston v. Kenner,* 111 Texas 484, 240 S.W. 894 (1922) ; *Houston v. Lockwood Investment Co.,* Tex. Civ. App. 1912, 144 S.W. 685, writ dis'm; *Highland Park v. Guthrie,* Tex. Civ. App. 1925, 269 S.W. 193, writ refused. This same rule prevails in many other states. 43 Am. Jur. 684, section 172; 50 A.L.R. 126.

Admittedly these cases do not settle the particular question before us; they announce the broad common-law principle that a municipality may not unreasonably discriminate in rates and charges and they do not determine the further question whether or not different rates based on nothing more than the limits of a municipal corporation are unreasonably discriminatory. These cases are authority, however, for at least this much: in the absence of (1) a showing that the discrimination has a reasonable basis or (2) a statute to the contrary, a municipality may not discriminate in charges or service as between those similarly

situated. Many decisions have transported the concept of proprietary capacity, as distinguished from a governmental capacity, from the cases involving the liability of a governmental unit for the torts of its agents to these decisions involving the duty of a municipality to offer its utility service at nondiscriminatory rates and have found in this concept a basis for the rule set out above. The concept of proprietary capacity is, however, hardly helpful in this situation. The real reason for the rule that, in so far as treatment of consumers is concerned, the municipally-owned utility is no different from the privately-owned utility is that the economic nature of the business has not changed; it remains a monopoly in spite of the change in ownership.

The change from private to public ownership may, in theory at least, eliminate or lessen the profit motive, but the consumer of utility services still cannot pick and choose his supplier of water as he does his grocer. The utility consumer is thus at the mercy of the monopoly and, for this reason, utilities, regardless of the character of their ownership, should be, and have been, subjected to control under the common-law rule forbidding unreasonable discrimination.

2  We do not pass upon the question whether the Petitioner is under a legal duty to serve Respondents with water and sewage disposal, nor do we pass on the question whether the rates charged by Petitioner, whether within or without its corporate limits, are required to be "reasonable" as that term is understood in public utility parlance (i.e., a "reasonable"rate  yields "a fair return on fair value"). But assuming that Petitioner has no duty to serve, it does not follow, under the common-law rule at least, that having elected to serve it may do so on such terms as it chooses to impose. The contention that the Petitioner, being under no legal obligation to serve, may do so on such terms as it chooses to impose brings before us a familiar argument in a new guise. It is the old, and logically appealing, argument that the greater includes the lesser power, that a governmental unit having the greater power of granting or withholding a privilege of service it perforce must have the lesser power of offering the privilege or service on whatever terms it may impose. That this is not necessarily true is demonstrated in the doctrine of unconstitutional conditions. Of the many cases applying this doctrine *Terral v. Burke Construction Co.*, 257 U.S. 529, 42 Sup. Ct. 188, 66 L. Ed. 352, 21 A.L.R. 186, and *Western Union Telegraph Co. v. Kansas,* 216 U.S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355, are

illustrative. The former case was a suit to enjoin the Secretary of State of the State of Arkansas from revoking the license of a foreign corporation which had, contrary to statute law of the state, removed a suit from the state to the federal courts. The argument was made, against affirmance of the judgment of the trial court granting the injunction, that the State of Arkansas having authority to grant or withhold the privilege of doing business in the state, as it admittedly did, it could condition the grant of the privilege in this manner or in any other manner it saw fit. This argument was rejected by the court, which stated that, "* * * a State may not, in imposing conditions upon the privilege of a foreign corporation's doing business in the State, exact from it a waiver of the exercise of its constitutional right to resort to the federal courts, or thereafter withdraw the privilege of doing business because of its exercise of such right, whether waived in advance or not." The analogy between the argument in the instant case and that in the Terral case, supra, is clear. It is also clear that the answer in this case must be the same as it was there; we therefore reiterate: assuming that the Petitioner is under no legal duty to serve it by no means follows that, having elected to serve, it may do so on a discriminatory basis. We do not mean to imply by citation of this authority that the ordinance is unconstitutional. As to this we express no opinion. These cases do illustrate, however, that the greater does not always include the lesser power and we think it important that this be understood for it has been the source of what we conceive to be error in the decision, in other jurisdictions, of the question before us.

The Petitioner being subject to the rule prohibiting unjustified discrimination between consumers of utility service, the question presents itself whether there is in fact any justification for treating the Respondents differently than the residents of the Petitioner city. The ordinance complained of contains, on its face, no such justification. The difference in rates, so far as is shown by the ordinance, is based entirely upon the location of the corporate limits. The Petitioner does not contend that the costs of supplying the service to Respondents vary so as to justify the difference in charges and the record is devoid of any evidence upon which to base such a contention. As was pointed out by the Court of Civil Appeals in its opinion below, the discrimination cannot be justified on the ground that the residents of the City of Texarkana, Texas, are liable to taxation to pay for acquisition of the water system. We are brought again, then, to what is apparent from the record of this case: the only difference be-

tween consumers who pay more and those who pay less for Petitioner's utility service lies in the fact that the former reside north of 29th Street while the latter reside South of 29th Street. The limits of a municipal corporation, of themselves, do not furnish a reasonable basis for rate differentiation. *Dallas Power & Light Co. v. Carrington,* Tex. Civ. App. 1922, 245 S.W. 1046, writ dis'm; *City of Montgomery v. Greene,* 1913, 180 Ala. 322, 60 So. 900; *Louisville & Jefferson County Metropolitan Sewer Dist. v. J. E. Seagram & Sons,* 1948, 307 Ky. 413, 211 S.W. 2d 122, annotated at 4 A.L.R. 2d 596.

The case of *City of Montgomery v. Greene,* supra, which was cited with approval in the case of *Dallas Power & Light Co. v. Carrington, supra,* was decided by the Supreme Court of Alabama on facts very similar to the present case. The Court there said:

"It may be stated, as a general proposition of law, that a corporation or municipality, authorized to supply water or lights to the inhabitants of a municipality, may not discriminate as to the rates charged, at least among those of the same class. Ferguson v. Birmingham Water Works, 164 Ala. 586, 51 South. 354, 27 L.R.A. (N.S.) 674, and note. 'The acceptance by a water company of its franchises carried with it the duty of supplying all persons along its mains, without discrimination, with the commodity which it was organized to furnish. All persons are entitled to have the same service on equal terms and uniform rates.' City of Mobile v. Bienville Co., 130 Ala. 384, 30 South. 447. The service cannot be arbitrarily limited to such consumers as are technically residents of the municipality, although the right of persons living within the city or beyond may depend upon the sufficiency of the supply and the contiguity or remoteness of such persons from the mains. 40 Cyc. 793, and cases cited; 30 Am. & Eng. Encyc. Law, 418, 419. *It may be that the act of 1891 left it optional with the city as to whether or not it would attempt to supply water beyond its corporate limits to points within its police jurisdiction, but, when it attempts to do so, it must be with uniformity, and without discrimination; and, if the citizens of Cloverdale are on its mains, they should be given the same uniform rate as is the general rate for others along or upon its mains, and a different rate, fixed wholly upon the corporate lines as the line of demarcation, in the absence of physical differences, is an unreasonable classification. This rule applies to municipalities operating their own water system, as well as to individuals or corporations, who undertake to supply water or lights.*" (Emphasis added.)

**3** Under the common-law rules, then, the ordinance is void. But the petitioner contends that all this has been changed by the statute referred to above. The Petitioner asserts that "the crux of this case in its final analysis rests upon a construction of section 3, Article 1108, R.C.S. of Texas." This article has been set out above. We find nothing in this language which would authorize the city to discriminate, at its pleasure, between its patrons. The first part of the section merely gives the city the right to extend its service to persons residing beyond the corporate limits of the city. This the city has done. The language "or permit them to connect therewith under contract with such town or city under such terms and conditions as may appear to be for the best interest of such town or city," if construed to accord with Petitioner's view, would return us to the primitive state of development in utility control when rates were determined by friendship and political power or pressure. *Troxel, Economics of Public Utilities* (1947) pp. 63-65, 667. This we cannot believe to have been the intent and purpose of the statute nor is its language such as to compel such a conclusion. The language of the statute contains no reference to rates, but, assuming that this provision of Section 3 gives the power to fix rates, the granting of such power, without express authority to fix unreasonably discriminatory rates, implies that the rate fixed pursuant thereto shall be, if not reasonable, at least not discriminatory.

The Petitioner makes no contention that it could exact of one nonresident one and one-half times the rate charged another nonresident nor does it contend that it could thus discriminate between its residents. Indeed, it seems very clear that, even reading the statute as Petitioner would have us read it, this could not be done. The essence of the Petitioner's contention, then, can be no more than this; that the statute establishes classes of consumers among which the Petitioner may discriminate without justification. We find no classification of consumers in the language of the statute nor do we find authority for unjustified discrimination there. True, the statute expressly authorizes a city to serve nonresidents of the city and by so designating them it has, perhaps, so classified them. But when the reasons for the enactment of the statute are considered we think it clear that the legislature did not intend to create a class of consumers against which the city could discriminate for any reason or without reason. The statute was enacted as the legislative answer to two prior decisions of our courts, namely *City of Paris v. Sturgeon*, 1908, 50 Tex. Civ. App. 519, 110 S.W. 459,

no writ history, and *City of Sweetwater v. Hamner,* Tex. Civ. App. 1923, 259 S.W. 191 writ dis'm. The former decision held that a municipal corporation was without authority, in this state, to contract to supply water to a nonresident; the latter decision held that a municipal corporation was without authority to extend its lines outside the municipal limits to supply water to a non-resident. The statute was passed expressly conferring upon the cities this authority, and, being directed as it was to the benefit of nonresidents it is but natural that they should be so designated.

4. We think the effect of the statute is that when a city decides to exercise this power to provide its utility service to customers outside the city limits it may then fix such service charges as it decides the situation requires; if it requires a higher charge than is fixed against residents of the city for the same service, the city may exact the higher rate. But whatever it fixes, a rate status between the city and its outside customers is thereby established and the city cannot thereafter arbitrarily change the rate so as to discriminate, or further discriminate, between them and customers residing in the city. This conclusion is certainly in line with well-established principles of public utility law.

For these reasons we hold that the statute did not change the common-law rule prohibiting unreasonable discrimination. The ordinance is therefore void unless the Petitioner can show, on another trial of the cause, that there is some reasonable basis for the difference in rates which it establishes. In order that the Petitioner may have an opportunity to make such a showing the judgment of the Court of Civil Appeals reversing and remanding the cause is affirmed.

Opinion delivered February 6, 1952.

MR. JUSTICE CALVERT, joined by Justices Smedley, Garwood and Griffin, dissenting.

I dissent.

The conclusion reached by the majority is contrary to the overwhelming weight of authority as evidenced by the decisions in those states in which the question has been decided under applicable common law rules. Atlantic Const. Co. v. City of Raleigh, 230 N.C. 365, 53 S.E. 2d 165; Barr et al v. City Council of Augusta (three cases), 206 Ga. 750, 753 and 756; 58 S.E.

2d 820, 825; City of Lexington v. Jones, 289 Ky. 719, 160 S.W. 2d 19; Davisworth v. City of Lexington, 311 Ky. 606, 224 S.W. 2d 649; City of Phoenix et al v. Kasun et al, 54 Ariz. 470, 97 Pac. 2d 210, 127 A.L.R. 84. Typical of the reasoning of all the courts is the language of the Kentucky Court of Appeals in the Davisworth case. The City of Lexington had for years permitted non-resident suburban citizens to connect with the city sewer system without charge. In 1935 the City enacted an ordinance levying a charge for non-resident use which ordinance was upheld in the Jones case, supra, and in 1948 another ordinance was passed increasing the non-resident use charges from a range of from $4.20 to $9.00 per year to a range of from $25.00 to $200.00 per year. The validity of the ordinance was attacked on the ground that it was discriminatory against non-residents. The Court said:

"Appproaching the heart of our particular problem, we may ask: Where the City has permitted non-residents to use its sewer system for a number of years, may it require them to discontinue such use? The query is answered by posing a counter-question: Why not? The City's essential duties are owed to its inhabitants. Non-residents have no lawful claim upon any city service. Any use of city facilities by non-residents is wholly permissive (in the absence of contract or estoppel) and not based upon legal right. In this case Lexington has done no more than acquiesce in what would be, without its permission, a trespass upon its property by appellants and those similarly situated. The latter became mere licensees, and acquired no prerogative claim to a continuance of such license. It follows that the City's consent could be withdrawn at will. * * * If then, the City may discontinue the service altogether, it clearly may fix in its own discretion the charges to be paid by those who wish its continuance."

The only case found in support of the common law view expressed in the opinion of the majority is the Alabama case of City of Montgomery v. Greene, 180 Ala. 322, 60 So. 900, later appeal, 187 Ala. 196, 65 So. 783, quoted from at length therein. It will be noted also from the quotation that the Alabama court held that a city could not refuse its water service to non-inhabitants, a holding clearly contrary to all authority found on the subject.

The only other authorities cited by the majority opinion in support of its statement that "the limits of a municipal corporation, of themselves, do not furnish a reasonable basis for rate

differentiation" are the Texas case of Dallas Power & Light Company v. Carrington, the Kentucky case of Louisville and Jefferson County Metropolitan Dist. v. J. E. Seagram & Sons and the annotation in 4 A.L.R. 2d 596. None of these authorities can afford the majority of this court any comfort.

The Carrington case by the Dallas Court of Civil Appeals cannot be regarded as of any precedential value because it involved a private utility and the application of statutes applicable only to private utilities, it was decided by a divided court, a writ of error was granted by the Supreme Court, indicating, if anything, disapproval of the majority opinion, and the writ of error and the entire suit was thereafter by agreement of the parties dismissed by the Supreme Court thereby causing its status to be the same as if it had never been filed. It has never since been cited as authority on the point here in issue by any court of this state or of any other state so far as I have been able to discover.

It is somewhat difficult to follow the reasoning of the Kentucky Court of Appeals in the J. E. Seagram & Sons case. There were rate factors involved other than mere corporate lines and the Court sent the case back for trial for the fixing of a rate for non-residents based upon these factors. The court nevertheless cited the case of the City of Lexington v. Jones, supra, with approval, and in the course of its opinion said: "If the basis for the differential (in rates between resident and non-residents of the City of Louisville) in this case were merely geographical or residential, the legal consequences would be different. *The real basis is the use and enjoyment of property by one class who owns it and another class who do not.*" (emphasis ours.) Moreover, the Davisworth case cited in the first paragraph of this opinion is a later case by the Kentucky court and if there is any conflict the opinion in the Davisworth case is the latest and controlling expression of the Kentucky court.

The annotation in 4 A.L.R. 2d 595-612 is more an annotation of decisions of state regulatory agencies than of courts, but even so, an examination will reflect that a majority of those decisions and the conclusions of the annotator support the common law rule advocated in this dissent. At the beginning of the annotation (bottom of page 596) we find this general rule: "The great majority of the cases found upon this point support the rule that public utilities may generally discriminate, in respect to rates, between consumers within and those outside

the municipalities served." A host of cases and decisions of regulatory agencies from nineteen states are cited in support of this rule. With particular reference to a municipally owned waterworks, the annotator says (top page 599) : "A municipally owned waterworks system supplying water without its corporate limits may, generally, charge more for that service than is charged users of the water service who reside within the corporate limits."

More important, the majority conclusion is directly contrary to the plain provisions of the controlling statutes, Article 1108, Section 3, V.A.C.S. What is now Article 1108 was first enacted in 1909. But neither the original act, nor the 1935 amendment, nor a subsequent amendment in 1937, imposed any *duty* on a city to extend its water or sewer lines outside the city limits or to sell its water or sewer services to non-residents. Article 1108 is not mandatory; it is permissive in character.

As applied to the question now before us the language of paragraph 3 of Article 1108 has never been interpreted by our courts, no doubt because it is too plain and unambiguous to require interpretation. When the statute declares that a city may *permit* non-residents to connect with its water and sewer lines and facilities "under such *terms* or conditions as may appear to be for the best interests of such town or city" it can mean nothing more nor less than exactly what it says. Article 10 of our statutes directs that words used in statutes shall be given their ordinary signification. The ordinary signification of the word "terms" in the context of this statute, which contemplates the furnishing of services for pay, certainly embraces the idea of connection charges and rates to be paid.

The citizens of North Texarkana do not occupy the same relationship toward the City of Texarkana as do its own citizens. "The primary purpose of a municipal corporation is to contribute towards the welfare, health, happiness and public interest of the inhabitants of such city, and not to further the interest of those residing outside of its limits." City of Sweetwater v. Hamner, Tex. Civ. App., 259 S.W. 191, 195. The City of Texarkana owes to its own citizens a duty to see that their health and welfare are protected through the continuing availability of water and sewer lines and facilities. It owes no such duty to the citizens of North Texarkana. It may furnish water and sewer services and facilities to residents of North Texarkana so long and only so long as the residents of that munici-

pality contract for such services and the authorities of that municipality permit; but being under no duty to furnish in the first instance it may discontinue such services, on reasonable notice, with or without cause. Being entitled to discontinue the services according to its want, it follows that the City can continue them on its own terms and conditions. This was its common law right. It is now its statutory right.

◆

The majority opinion does *not* hold that the City of Texarkana could not withdraw the water and sewer service it furnishes the non-residents; it assumes that it could .The opinion does *not* hold that the ordinance, or the statute, we take it is unconstitutional; it assumes that it is constitutional. It does *not* hold that Article 1108, Section 3, does not give the city power to fix rates; it assumes that it does. It seems, therefore, that the judgment of the Court of Civil Appeals is affirmed in the face of the plain wording of the statute for two reasons, as follows: (1) "Assuming that" Section 3 of Article 1108 "gives the power to fix rates, the granting of such power, without express authority to fix pursuant thereto shall be, if not reasonable, at least not discriminatory"; and (2) that although a city may fix such rates for non-residents as its discretion directs when it first decides to offer them its utility services, once a rate is fixed "a rate status bewten the city and its outside customers is thereby established and the city cannot thereafter arbitrarily change the rate so as to discriminate, or further discriminate, between them and customers residing in the city." Aside from being wholly inconsistent with each other, the second reason inferring that rates fixed at the beginning of outside service may be arbitrary and discriminatory and the first reason specifically saying that they may not be, both reasons are at once unrealistic and contrary to persuasive authority.

The first reason is unrealistic because it is hardly thinkable that the legislature would by express language authorize cities "to fix unreasonably discriminatory rates" for their non-resident customers. Moreover, the legislature made the authority about as broad as it could be made when it conferred on cities absolute discretion to charge such rates "as may appear for the best interest" of the cities. The conclusion of the majority that the language of the statute is not sufficiently broad to authorize the City of Texarkana to charge higher rates to non-residents is contrary to a decision of the Supreme Court of South Carolina in the case of Childs v. City of Columbia, 87 S.C. 566, 70 S.E. 296, 34 L.R.A. NS 542 and contrary to a decision of the

Supreme Court of Colorado in the case of City of Englewood v. City and County of Denver, 123 Colo. 290, 229 Pac. 2d 667, the two latter decisions involving construction of statutes highly similar to the Texas statute. The South Carolina statute authorized cities to furnish water to non-residents "upon such terms, rates and charges" as might be agreed upon "when in the judgment of said city council it is for the best interest of the municipality so to do." In a suit involving the right of the City of Columbia to charge non-residents higher rates than were charged to residents, the court said: "Thus the making of the contract and the terms, rates, and charges are left entirely to the discretion of municipal authorities, and the interest of the municipality is the sole factor to be considered in deciding whether the contract shall be made, and if so, on what terms, and for what period * * *." The Colorado statute authorized cities and towns to supply water to consumers outside their corporate limits "and to collect therefore such charges and upon such conditions and limitations as said towns and cities may impose by ordinance." In a rate suit between residents of the City of Englewood against the City of Denver from whose water system plaintiffs obtained their water, the court said that the City of Denver was "not under public duty to furnish water to Englewood at any kind of rates or to furnish water at all." The trial court's judgment dismissing the suit was affirmed.

The second reason given is unrealistic in that its necessary consequence will be to cause cities and towns to charge non-residents exorbitantly high rates when they are first given service so that an unsatisfactory "rate status" will not arise to plague them in the future. The "rate status" solution of the majority is wholly out of keeping with a part of the record before us. It may be a sufficient basis for the ruling of the majority on that part of the ordinance fixing water rates but it will not do at all as a basis for the ruling on that part of the ordinance fixing sewer rates and charges. The City of Texarkana has owned and operated its sewer lines and disposal plant for many years. The only evidence in the record as to rates charged non-residents when sewer service was first offered them is the testimony of the plaintiff Ross Perot who was permitted to connect with the Texarkana sewer system some twenty-five years ago and who was charged eighteen dollars per year for the service at a time when residents of Texarkana paid nothing. Thus the rate status established when the service was first offered to non-residents was based on a charge to non-residents

eighteen times as great as that made to residents. The sewer charges to non-residents in the ordinance here under attack is only twice as great as the charge to residents. Clearly then the plaintiffs are not entitled to an injunction against collection of the sewer charges on the ground that they arbitrarily and discriminatorily depart from a fixed "rate status."

I have not been able to find any support in recorded decisions for the "rate status" theory. On the contrary it has been rejected in a great many of the decisions heretofore cited in this opinion. True, the contention has not heretofore been based upon the theory that a rate status was created from which the city could not arbitrarily depart; but the same theory has been presented to the courts in at least two ways, viz: (1) that an ordinance establishing a given rate for non-residents was a contract with the non-residents which the city was not at liberty to breach; and (2) that the city was estopped to raise rates to non-residents where they had laid pipe and connected with the city water or sewer systems in reliance upon a lower rate fixed by ordinance. There is no essential distinction between these contentions and the "rate status" theory.

The majority fear that to construe the statute so as to uphold the ordinance here "would return us to the primitive state of development in utility control when rates were dtermined by friendship and political power or pressure." I doubt that such a consequence is reasonably to be expected, but it is not enough to defeat the plain wording of the statute to say that it may lead to unjust or unsound results. It is our duty to enforce the statute as written, leaving to the legislature the right and the duty to effect a change if a change is needed. Simmons et al v. Arnim et al, 110 Texas 309, 220 S.W. 66, 70; Texas Highway Commission v. El Paso Bldg. & Const. Trades Council, 149 Texas 457, 234 S.W. 2d 857, 863; Col-Tex. Refining Co. v. Railroad Commission of Texas, 150 Texas 340, 240 S.W. 2d 747.

The judgment of the Court of Civil Appeals should be reversed and the judgment of the trial court affirmed.

Opinion delivered February 6, 1952.