The CITY OF LIVINGSTON et al.,
Appellants,

v.

Ruby WILSON et al., Appellees.

No. 6128.

Court of Civil Appeals of Texas.

Beaumont.

Feb. 20, 1958.

Rehearing Denied March 12, 1958.

McClain & Harrell, Conroe, J. S. Holleman, Livingston, for appellants.

R. C. Musselwhite, Lufkin, for appellees.

ANDERSON, Justice.

The appeal is from a judgment of the district court of Polk County making a temporary injunction permanent and containing other allied provisions. In its most comprehensive sense, the question involved is perhaps that of whether, and if so, upon what conditions, appellees, who live outside the city's limits, are legally entitled to have the City of Livingston, which owns and operates its water system, supply them with water for domestic use. In the sense in which it is primarily and dominantly presented by the record, however, the question is that of whether, and if so, upon what conditions, appellees are legally entitled to have the city supply them water through particular mains or feeder lines. A summary of the facts is essential to a proper understanding of the issues involved and the trial court's judgment, and will be first supplied. It is sufficient at this point to say that the city was ordered to supply appellees with water.

Appellees live along highway No. 146, which, because it connects Livingston and Liberty, Texas, is also known in and around Livingston as the Liberty road. Appellees H. S. Denham and wife, R. S. Denham, live approximately a thousand feet, and appellee Ruby Wilson lives approximately a half mile, from where the highway intersects Livingston's south boundary. The city is selling water to a number of customers along the highway, and has been doing so continuously since 1944. Appellee Wilson became a customer in 1948, and the Denhams became customers in 1953. They remained customers until use of the water main through which water had been theretofore supplied them was discontinued by the city in 1954. A new water main was installed along the highway and put into use in 1954, but the city refused to make service connections to it for appellees or to authorize appellees to make connections for themselves, without the consent of the officers or representatives of Liberty Road Water District, an organization or association which the city recognizes as being owner of the main.

The city having refused to make connections for them, appellees acted for themselves, making connections to the new main. The city disconnected the Denhams' service lines and was threatening to disconnect Mrs. Wilson's. Appellees brought suit against the city, its mayor, councilmen, and water superintendent to restrain them from disconnecting Mrs. Wilson's lines, to compel them to re-connect the Denhams' lines

to either the old or the new main, and to compel the city to continue supplying them water, upon their paying therefor at the same rates at which the city supplies water to domestic users within its corporate limits. Liberty Road Water District and its officers and directors, the officers and directors acting both officially and individually, intervened in the suit as defendants. They filed both an answer and a cross-action. By the latter, they sought to enjoin the city from making service connections for appellees to the new main, the appellees from themselves making connections, and the city from supplying appellees water through the main, until appellees have paid Liberty Road Water District $250 for each connection that is to be made for them.

Liberty Road Water District, as may have been surmised, is not a conventional or statutory water district. In fact, it is not a water district at all. It is but an association of individuals who live along highway No. 146, outside the city limits of Livingston, and who, for limited purposes, have banded together by common consent, under an assumed name, have reduced their compact to the form of by-laws, and have delegated the management of their mutual affairs to directors and other officers. Those constituting the association contributed the money with which the pipe and ancillary equipment that make up the out-city portion of the distribution system that was put into use along the highway in 1954 were purchased, an aggregate sum in excess of $23,000. Each member contributed a minimum of $250, and some contributed considerably more. The association or so-called water district was formed merely as a medium through which its members could effectively and conveniently act in purchasing the pipe and ancillary equipment, in exercising acts of ownership over the distribution system once it had been installed, and in providing for the system's upkeep. It neither buys nor sells water and is not otherwise engaged in business for profit. Assessments against its members aside, it has no source of revenue except payments made by new members for the privilege of having service connections made to the distribution system. Pending installation of additional fire hydrants and repayment of $5,000 that some of the members individually borrowed for the benefit of the group, each new member is being charged the sum of $250 for the aforesaid privilege—the same amount, it will be noted, as the minimum that was contributed by each of the original members. However, in the improbable event a surplus accrues from this source, it is to be distributed among the members of the association on a pro rata basis.

The association was formed, and it or its members purchased the component elements of the new distribution system, in these circumstances: In June, 1953, the mayor of Livingston notified the city's water customers along highway No. 146 that, due to the aged and defective condition of the water main then in use and to the resultant wastage of water, the city was going to cease supplying anyone water through the main. He also advised them that the city was not financially able to replace the main and would not undertake to do so. Meetings were thereupon held between interested persons and the city's officials, and the latter agreed that if those desiring water would purchase all pipe and ancillary equipment for a new and adequate distribution system, and would pay for the upkeep of the system after installation, the city would itself install the new system, make service connections to it and install individual meters for eligible persons (at no cost to those having service connections to the old main), and would supply such persons water, upon their paying therefor at the prevailing rates in effect for others similarly situated. Liberty Road Water District was then formed and negotiations between its officers or representatives and the city's officials took place. In addition to again agreeing to the matters above mentioned, the city officials agreed that title to the new system would be in Liberty

Road Water District or its members; that the city would not make service connections to the new system except when authorized to do so by the officers of the so-called district; and that, allowance being made at an agreed annual rate for depreciation of the system, the city would reimburse Liberty Road Water District or its members the cost of the component elements of the system if the area served by the system should become a part of the city.

Pursuant to the agreement of its officials, the city did install the new distribution system, made service connections to it and installed individual meters for all members of Liberty Road Water District (charging therefor only those who had had no connections to the old main), and has since supplied the members water. Furthermore, its employees operate the system, look after it, repair it when necessary (but at the expense of the association), and in general perform with reference to it essentially the same functions they would if it were city owned. In addition, all of those for whom service connections to the system are recognized as having been legitimately made are looked upon and dealt with by the city as the city's own customers. City employees read the meters; the city sends each customer a bill for the water the customer has used; and the customer pays the city. Despite all of this, however, the city professes to own no interest in the out-city portion of the new distribution system and to have no right to determine who shall be supplied water through it. It and the other defendants pled this lack of ownership and lack of right, and all direct evidence touching the subject was in keeping with their pleadings.

Except for the fact that no formal organization such as Liberty Road Water District figured in it, the history of the greater part of the superseded and abandoned distribution system, if not of all of it, is the same as that of the new one. The history of a portion of the system is not certain, however, and it is upon the evidence touching this portion that appellees largely rely.

What we have referred to as the abandoned distribution system was, in reality, nothing more than a water main which was approximately two miles long and which was made up of 3″, 2½″, and 2″ pipe. It began west of the highway at what had formerly been a CCC camp, where it connected to a pre-existing, city-owned main. It then ran to the highway in an easterly direction and along the highway in a southerly direction. Three-inch pipe extended from the beginning point to the highway and along the highway for a distance of approximately a half mile. According to some of the evidence, it reached to a point which was opposite both the southwest corner of appellee Ruby Wilson's property and the northeast corner of a building which was referred to as Robert Lee's Shop. A short, step-down span of 2½″ pipe followed, and 2″ pipe made up the rest of the line.

The uncertainty we mentioned attends the portion of the line that was made up of 3″ pipe, and it was by this portion that appellees were served.

The evidence was in conflict with reference to whether the city furnished the 3″ pipe. There was evidence tending to show that the city had never owned any pipe of that size. And one of eight men who purchased and paid for the 2″ pipe testified that the 3″ pipe was given to him and his associates by a contractor who had just finished building a strip of highway in the area. Another of the eight, however, testified that the city gave the group the 3″ pipe.

The evidence was likewise conflicting with reference to whether the 3″ pipe and the 2″ pipe were installed together and initially put into use at the same time. Appellees' evidence was to the effect that installation of the 3″ pipe was one undertaking and that installation of the 2″ pipe was another and distinct undertaking which was conceived and executed after the 3″ pipe had been already in use for quite some while.

There also was a conflict with reference to whether one wishing to have a service connection made to the 3″ pipe needed the consent of anyone besides city officials. Appellees' evidence was to the effect that one did not and that the charge the city made for such a connection was the same as the charge it made for service connections effected within its corporate limits.

Furthermore, the evidence was indefinite, if not in actual conflict, regarding at whose expense the 3″ pipe was kept in repair. Repairs were paid for by the city but there was evidence indicating that from time to time the city collected money for the use and benefit of the purchasers of the 2″ pipe and retained such money and applied it toward the cost of keeping up the line as a whole.

The eight men who purchased and paid for the 2″ pipe lived south or southeast of the terminal end of the 3″ line. They purchased and paid for the pipe in order that they themselves might receive water, and they appear to have been generally recognized as owners of so much of the line as was made up of that pipe. Service connections were made to it only with their consent and they charged fifty dollars for each connection they authorized. We gather from the evidence as a whole, however, that the city was perhaps authorized to make a connection for anyone willing to pay it fifty dollars and that it was authorized to retain the money so received and use it in keeping up the line.

There was evidence pro and con as to the condition of the old line at the time use of it was discontinued. The fact remains, though, that none of the pipe in it was used in the new distribution system. The new main is made up throughout of 6″ pipe.

To complete the picture created by the evidence, we add these miscellaneous facts:

A considerable part of the old line nearest the source of water supply was taken up by individuals after the new distribution system was put into use, and the pipe was either disposed of or was used by the individuals for their own private purposes.

The base rate of charge for water supplied through the new system is the same as the base rate that was in effect when the old line was in use. It is, and all along has been, fifty cents per month higher than the base rate in effect within the city. Some witnesses were of the impression that the extra charge was for reading meters, while others were of the impression that it was for upkeep of the line.

The City of Livingston is incorporated under the general laws.

The city has outstanding both tax and revenue bonds which have been issued in connection with its water system.

The city has not expressly contracted with Liberty Road Water District nor with anyone else to supply water to anyone through the new system for any specific period of time, nor did it ever expressly contract with appellees or any others served by the old line to supply them water for any specified time.

There was no evidence to show that appellees or anyone else served by the old line ever expressly agreed with the city to accept and pay for water for any specified time, nor was there any to show that Liberty Road Water District or any other interested in the new distribution system has expressly contracted to accept and pay for water for a definite time.

There was likewise no evidence of an express lease contract between the city and Liberty Road Water District or anyone else affecting either the new distribution system or the old one.

Appellees, needless to add, are not members of Liberty Road Water District, and they have contributed nothing toward the cost of purchasing and installing either the new distribution system or the old one.

Appellees testified that they had offered to pay for water they had received through the new system since making their own connec-

tions to it but that the city had refused to accept payment. This was not denied.

The plaintiffs alleged in their petition that for "many years" the city had "owned, maintained and controlled" a water line along the highway and had supplied them water through it, at prices which were the same as those charged for water supplied within the city for domestic use; that in years past, the city had "contracted" to supply them water through the line; that the city had recently "reconstructed" the line or had had it "reconstructed"; that the sum of $250 per connection which the city was demanding that they pay for service connections to the new line was much more than was being charged for service connections within the city and was discriminatory, exhorbitant and unreasonable; that, in an effort to justify such a charge, the city was resorting to the "subterfuge" of claiming that the line belonged to individuals and not to it; that, irrespective of whether it had been responsible for having the line "reconstructed", the city had "assumed control" of the line and was then in exclusive "control" of it and was pumping its water through it and selling the water to others who resided along the highway; that, having elected to install a water line outside its corporate limits or "having elected to exercise control thereover and to flow its water through the same to be sold to persons living along and on said line" outside its corporate limits, the city was precluded by law from charging more for a service connection to the line or for water supplied through the line than it would charge for a connection or for water inside its corporate limits; that in seeking to charge them $250 per connection, the city was discriminating against them; that, having "contracted" to supply them water through the old line, and having supplied them water through it for a long time, and since they had paid for all water they had received, the city was estopped from altogether ceasing to supply them water and was obliged, therefore, to supply them water through either the old line or the new one.

The remaining allegations in plaintiffs' petition pertained either to ancillary matters or else to distinct and subordinate phases of the suit, and we do not deem it necessary to detail them.

Trial was to the court, without the intervention of a jury.

Findings of fact and conclusions of law do not appear to have been requested, and none were filed, as such. Among the recitations of the judgment, however, are the following:

"* * * the court * * * is of the opinion and finds that the water line extending on, in and along the highway right of way of State Highway No. 146 from the corporate limits of the City of Livingston, Texas in a southeast direction to a point West of and immediately opposite the southwest corner of the property of the plaintiff, Ruby Wilson, described in her petition in this cause and at a point directly East of and opposite the northeast corner of the building known as and described in the evidence in this cause as the Robert Lee Shop, was originally laid, installed and owned by the City of Livingston, Texas and was thereafter continuously operated as a water line of The City of Livingston, Texas in connection with its water system and that the present water line on, in and along said highway from the corporate limits of the City of Livingston, Texas where it crosses the said highway to said points on said highway at and opposite the southwest corner of the Ruby Wilson property and the northeast corner of the Robert Lee Shop is a replacement, alteration and repair of the said original water line of the said City of Livingston, Texas and that the property now occupied by H. S. (Buster) Denham and wife, R. C. Denham, and Ruby Wilson has each been served with water from said original water line for a continuous period of several years by The City of Livingston, Texas and that the

said original water line and its replacement, alteration and repair has at all times been and is now a part of the water lines and water distribution system of The City of Livingston, Texas and The City of Livingston, Texas has heretofore contracted with [the plaintiffs] to furnish said plaintiffs water from said water line upon their payment of the usual water charges for such water as has been charged by said city against the residents on and along said line before said repairs, alterations and changes were made in said water line * * * and that the said plaintiffs have each offered to continue to pay to the said City of Livingston, Texas the said water rentals and charges as has heretofore been fixed for said water furnished to them by said City and that the intervenors in this cause have no right to disconnect the plaintiffs from said line and have no right to interfere with the said City from furnishing water to plaintiffs through said water line."

As reflected by the final judgment, the temporary injunction that was granted in the case ordered that the city, its mayor, councilmen and water superintendent immediately re-connect the Denhams' service lines to "the water line lying and being on Highway 146"; that they desist and refrain from disconnecting Mrs. Wilson's service lines from "said water line lying on and along State Highway No. 146"; and that, pending final hearing, they furnish the Denhams and Mrs. Wilson water "through said water line," upon their paying therefor "at the rate charged for such quantities of water so used against the citizens of Livingston, Texas at and in residences." In addition to decreeing that the temporary injunction be made permanent, the trial court decreed in the final judgment that the city, its council and its water superintendent be "permanently and perpetually enjoined from disconnecting the premises and water facilities" of the plaintiffs from the "water line lying in, along and on State Highway No. 146," and from failing and refusing to furnish plaintiffs water through the line, upon their paying therefor "at the rate charged for such quantities of water so used against the citizens of Livingston, Texas at and in residences situated in said city"; that the intervenors be "permanently and perpetually enjoined from interferring in any manner with the said City of Livingston, Texas and its water department furnishing water to the said plaintiffs in this cause from the said water line" and from "demanding and collecting from the said plaintiffs * * * any sums of money for their privilege of receiving water from and through said water line and for their use of said water from and through said water line"; that the intervenors take nothing by their intervention and cross-action; that the city, its council, and water department be "perpetually and permanently required to furnish water to the premises of plaintiffs on their lands described in their petition in this cause at the rate charged for such water through the water system of the City of Livingston, Texas against the residents of the City of Livingston, Texas at and in residences in said city"; and that, since the plaintiffs had offered to pay for water received by them through the new system and the city had refused to accept payment, the plaintiffs would only be required to pay for water received by them after the date of the judgment. The judgment also provides that it is to bind the parties, their heirs, successors and assigns. Half of the costs were adjudged against the city officials, in their individual capacities, and half was adjudged against the individual intervenors.

Appellees were all being supplied water through the new distribution system at the time the judgment was rendered.

Appellants challenge the legality of the judgment in each of its three principal aspects. They say the court erred in ordering the city to furnish water to the premises of appellees and to appellees, and especially so in ordering the city to "perpet-

ually and permanently" furnish water to the premises of appellees and to appellees and to appellees' heirs and assigns. They say, also, the court erred in ordering the city and members of Liberty Road Water District to permit appellees to make service connections to the new distribution system free of charge, and in ordering the city to supply appellees water at the same price it supplies water for domestic use to persons living within its corporate limits.

We agree with all three contentions.

▮ In any event, the court erred in ordering the city to supply water in perpetuity to appellees' premises and to appellees and their heirs and assigns. Since appellees live outside the city's limits, the city was and is under no inherent duty to supply them water. Except for Article 1108, Vernon's Ann.Civ.St., which confers the authority but imposes no duty, it would even be without authority to do so. City of Paris v. Sturgeon, 50 Tex.Civ.App. 519, 110 S.W. 459, error refused. Even assuming, therefore, that for some reason the city had been under an enforcible duty for the time being to supply appellees water, the duty would have continued only for the duration of the contract by which it was imposed or for the duration of the circumstances from which it was imposed by operation of law, and the judgment should have been tailored accordingly.

▮▮ In any event, also, the court erred in ordering the city to supply appellees water at the same price rates applicable to the city's residents. The base rate in effect for non-residents of the city who are being served by the new distribution system is fifty cents per month higher than the rate that is in effect for the city's residents, and appellees should be required to pay at the higher rate if they are to be served. The rate is not invalid on the ground that it is discriminatory. Any conclusion that the differential between the two rates is arbitrary, unreasonable and unjustified would be without evidence to support it.

Furthermore, the same differential between the in-city and out-city rates has existed ever since the distribution system that has since been abandoned was first put into use in 1944, and this consideration alone appears to be a sufficient answer to appellees' claim that the out-city rate is invalid because arbitrarily discriminatory. City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622.

▮ It may be that the errors just mentioned would require only a reformation of the trial court's judgment, and not a reversal, if in its other aspects the judgment were supported by the record, but it is not. There was, in our opinion, not only no evidence to show a right on the part of the appellees to be supplied water through the new distribution system, but none to show a duty on the part of the city to supply appellees water at all.

It is only from or through the City of Livingston that appellees claim to have acquired a right to be supplied water through the new distribution system. In order, therefore, to demonstrate that appellees have not the right, it is only necessary to demonstrate that the city has at no time been empowered to confer it.

The city has lacked such authority not because it contracted it away, but because exclusive authority to grant or withhold the right to be served by the system has all along rested in Liberty Road Water District, as an attribute of the District's title to the system. We take it that there can be no doubt that such authority is primarily an attribute of title to the system. And we are of the opinion that the evidence conclusively establishes that the Water District (by use of which name reference to the organization's membership is actually intended) has owned the new system from the latter's inception. We are also of the opinion that there is no evidence to show that the City of Livingston has acquired from the District the authority in question.

The Water District indisputably purchased and paid for all component elements of the new system, thereby acquiring title to them. It has not voluntarily parted with such title or with any material right which accrued to it with the same. And we think no loss of its title or of a material right incident to title is shown to have resulted by operation of law. Neither the District's title nor its authority was adversely affected by the City's conduct in assembling and installing the system at its own expense. Not only did the city intend to donate its services, but it acted under an express agreement that title to the installed system was to be in the Water District. Nor has the District's authority over the system been impaired in material aspects by the District's having permitted the city in most respects to conduct itself in reference to the system as if the system were city owned. No grant by the District to the city of authority to confer the right of being served by the system can be implied, because the District expressly reserved that authority to itself. We think it clear, therefore, that appellees have no present right to be served by the new system.

In arriving at the foregoing conclusions we have not been unmindful of the trial court's conclusion that the city owned that portion of the old water main that was made up of 3″ pipe; nor of its finding that the new system is a "replacement, alteration and repair" of the old; nor of its finding or conclusion that the old system was, and that the new system is, "a part of the water lines and water distribution system of the city." We are merely of the opinion that the findings and conclusions are, for the most part, without evidence to support them. The new system is not, in any fair sense of the words, "an alteration and repair" of the old one. It has no physical attribute in common with the old system except the one of general location. Moreover, the new system is not a "replacement" of the old one except in the sense that in the area formerly served by the old system it is performing essentially the same function that system performed. Nor is the new system "a part of the water lines and water distribution system of the city" except in the physical sense of being connected to the city's system, which is the source of water supply. It is not a part of the city's system in the sense that the city would be entitled to prevent Liberty Road Water District from removing and selling it (the new system) if the District should elect to do so.

Passing now to the question of the city's duty to supply appellees water, we first point out that the matters which have already been discussed render it clear that during the time the new distribution system has been in use no new duty on the part of the city to supply appellees water has arisen under the laws appertaining to public utilities. Having neither owned the system nor been empowered to confer the right to be served by it, the city can hardly be said to have been functioning in the affected area as a public utility while the system has been in use. We therefore only need to determine whether or not, as a result of the city's relationship to the old distribution system and of what transpired between the city and appellees while the old system was in use, a duty on the part of the city to supply appellees water exists by contract, by estoppel, or by virtue of the laws appertaining to public utilities. And, as previously stated, we think it does not.

Except as they are to be implied from the city's conduct in accepting appellees as customers on the old distribution system and in thereafter supplying them water through that system and charging therefor, no contracts between the city and appellees and no promises by the city to supply appellees water were shown ever to have been made. And such contracts, if any, as resulted by implication from the circumstances just mentioned were, at most, only contracts at will. Sturgeon v. City of Paris, 58 Tex.Civ.App. 102, 122 S.W. 967, 969, error refused. They were termi-

nated by the city, after due notice to appellees. The city is under no contractual duty, therefore, to supply appellees water.

If our conclusion that nothing more than contracts at will resulted from what transpired between the parties while the old *distribution system was in use is in conflict* with the holding in City of Dallas v. Brown, Tex.Civ.App., 150 S.W.2d 129, a case cited by appellees, we nevertheless feel constrained, both by reason and by what appears to be the weight of authority, to adhere to the views we have expressed. However, we think that basically there is no conflict. Whereas we are here directly concerned with whether, all other considerations aside, the City of Livingston is under a contractual duty to supply appellees water, the real matter in issue in the Brown case was that of whether, at the time service to her was discontinued, Mrs. Brown was in truth a customer and entitled to a customer's rights. The city's duty to supply her water if her status was that of a customer existed independent of contract, under the laws appertaining to public utilities, though the court did not in its opinion clearly point this out.

The facts that have just been considered in connection with the contract phase of the case are the only ones which could be relied upon to work an estoppel against the city, and we think they are insufficient for that purpose. *Appellees do not themselves contend the contrary, and so we deem it unnecessary to discuss the matter in detail.*

There remains the question of whether by virtue of the laws appertaining to public utilities a duty on the part of the city to supply appellees water exists as a result of the city's relationship to the old distribution system. And in dealing with it, we shall proceed upon the theory that in the out-city area that was being served by that portion of the old system that consisted of 3″ pipe, and during the time the old system was in use, the city functioned as a public utility to the full extent it was

empowered to do so. *The trial court's* findings of fact and conclusions of law and the presumptions that must be indulged in favor of the trial court's judgment probably require such an approach. We are probably also required to proceed upon the theory that the evidence did not conclusively establish that at the time the city discontinued use of the old system the system, *or so much of it as consisted of 3″ pipe*, was no longer reasonably serviceable or that it was itself being operated at a loss— though the evidence did show that the city's entire water system was being operated at a loss. In final analysis, therefore, the question with which we are confronted is *really that of whether, despite the fact* that it was functioning as a public utility as fully as it could, the city was at liberty to discontinue at its own will all of its out-city service in the affected area, having first given reasonable notice of its intention to do so. And we are of the opinion that it was, even assuming that it was as fully subject to public utility law as though it *had not been a municipal corporation.* The city was under no statutory or contractual duty to continue the service, and entry into the public utility field did not, in and of itself, subject it to the duty of continuing in that field indefinitely or to the duty of continuing indefinitely to supply the service that was involved. San Antonio St. Ry. Co. v. State, 90 Tex. 520, 39 S.W. 926, 35 L.R.A. 662; West v. Probst, Tex. Com.App., 6 S.W.2d 96, 104. Also see Lenzen v. City of New Braunfels, 13 Tex. Civ.App. 335, 35 S.W. 341, 344, and the dissenting opinion in City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622, 628.

Water and sewerage systems were involved in the case of West v. Probst, and we quote from the case the following:

"Under our view of the law as applied to the deed and the findings of fact by the trial court, West and the corporations holding under him assumed the duties and obligations of those who operate public utilities, and

as such they have the right to discontinue their operation. San Antonio Street Ry. Co. v. State, 90 Tex. 520, 39 S.W. 926, 35 L.R.A. 662, 59 Am.St. Rep. 834; East Ohio Gas Co. v. City of Akron, 81 Ohio St. 33, 90 N.E. 40, 26 L.R.A.,N.S., 92, 18 Ann.Cas. 332; Weems Steamboat Co. of Baltimore City v. People's Co., 214 U.S. 345, 29 S.Ct. 661, 53 L.Ed. 1024, 16 Ann. Cas. 1222; Laighton v. City of Carthage, C.C., 175 F. 145. However, under the facts of this case, equity would require that the patrons of the two companies be given a reasonable time in which to provide themselves with water and sewerage otherwise, or a substitute for such sewerage."

Though it was perhaps dicta, we also quote from Lenzen v. City of New Braunfels, supra, the following [13 Tex.Civ.App. 335, 35 S.W. 344]:

"The city could not have been held liable for failure to construct and operate the water works in question; nor can it be controlled in the exercise of its privilege to abandon such works, if it sees proper to do so."

If the majority of the court in City of Texarkana v. Wiggins, supra, entertained real doubt as to the city's right to terminate its service to North Texarkana, it was probably because the city had in that instance purchased a water works which was committed to serve both areas.

By their sixth point, appellants allege that the judgment of the trial court is void because too indefinite. And in their seventh point they charge that the trial court erred in denying the City of Livingston the right to collect from appellees for water supplied appellees through the new distribution system prior to rendition of judgment. In view of the disposition that is to be made of the case, we deem it unnecessary to decide the points.

The judgment of the trial court is reversed, and judgment dissolving the injunction is here rendered.