# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00723-CV

**Ira W. Black, Jr., Appellant**

**v.**

**City of Killeen, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
## NO. 169,363-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

Appellant Ira W. Black, Jr. appeals the district court=s declaratory judgment entered in favor of the City of Killeen. Black owns five apartment buildings built between 1986 and 2000 in the City of Killeen, a home rule municipality. *See* Tex. Const. art. XI, ' 5; Tex. Loc. Gov=t Code Ann. ' 5.004 (West 1999). At issue in this appeal are tap fees assessed by the City for apartment buildings Black constructed in 1998 and 2000.[1] Prior to 1998, Black paid the City a tap fee per *building* connection.[2] In 1998 and 2000, pursuant to a 1997 amendment to the tap fee ordinance, Black paid a per *living unit*

---

[1] ATap fees@ are assessed by the City to cover the costs of connecting a customer to the City=s water and sewer system.

[2] For the apartment buildings built in 1986, 1989, and 1994, Black paid only for a water tap and a sewer tap connection. He paid: (i) $1000 for a water tap and $35 for a sewer tap in 1986; (ii) $1000 for a water tap and $35 for a sewer tap in 1989; and (iii) $1072 for a water tap and $200 for a sewer tap in 1994.

connection charge.[3] In compliance with the amended fee schedule, but under protest, Black paid an initial base tap charge, plus an additional $300 water tap fee and $300 sewer tap fee for each living unit in the complexes.

Black filed a declaratory judgment seeking a determination that the fees under the amended ordinance were (i) unreasonable, (ii) invalid impact fees, and (iii) discriminatory. The City filed a counterclaim, seeking a declaration that the water and sewer tap fees were valid, enforceable, and not impact fees. At trial, Black called a rate expert, Bruce Fairchild, who testified in support of Black=s position. Black also called Killeen City Manager, David Blackburn, as an adverse witness to testify regarding various aspects of City policy and the City=s process of amending the tap fee ordinance. The City called its own rate expert, Searcy Willis, to controvert Black=s expert witness.

The district court granted the City=s request for declaratory relief and issued findings of facts and conclusions of law in support of its judgment. In five points of error, Black appeals that judgment, contending that the district court erred in finding the City=s tap fees reasonable, valid, and non-discriminatory. Because we conclude that Black failed to meet his burden of rebutting the presumptive validity of the City=s tap fee ordinance, we affirm the trial court=s judgment.

---

[3] In 1997, the City amended its ordinance to assess tap fees based upon one of five possible classifications. Killeen, Tex., Code of Ordinances ' 30-102(b). For multi-family dwellings, *i.e.*, apartment complexes, the City began charging a connection (tap) fee Afor each living unit,@ as opposed to each building connection, as it had done prior to 1997. *See id.* ' 30-102(b)(2).

2

*Standard of Review*

We presume a home rule charter provision is valid and will not interfere with matters of municipal government unless the provision is shown to be Aunreasonable and arbitrary, amounting to a clear abuse of municipal discretion.@ *Dallas Merchant=s & Concessionaire=s Ass=n v. City of Dallas*, 852 S.W.2d 489, 490-91 (Tex. 1993); *see also City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792 (Tex. 1982) (AA city ordinance is presumed to be valid[.]@) (citing *Thompson v. City of Palestine*, 510 S.W.2d 579, 582 (Tex. 1974); *Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971)). A person challenging an ordinance bears an Aextraordinary burden@ of establishing that the municipality abused its discretion in enacting the ordinance. *Comeau*, 633 S.W.2d at 792-93 (citing *Thompson*, 510 S.W.2d 579; *Waxahachie v. Watkins*, 275 S.W.2d 477 (Tex. 1955)). In assessing whether the party attacking an ordinance should prevail, we Aconsider all circumstances and determine, as a substantive matter, if reasonable minds may differ as to whether a particular@ ordinance is a reasonable exercise of the municipality=s authority. *Id.* at 793. Where the trial court issues findings of fact and conclusions of law, we apply a sufficiency of the evidence review to the factual findings and review its conclusions of law *de novo*. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). Thus, although we rely on the fact finder to resolve disputed facts and accord those facts the same status as if they were determined by a jury, the ultimate issue of whether the City=s tap fee is valid is a question of law. *See City of Austin v. Travis County Landfill Co.*, 45 Tex. Sup. Ct. J. 511, 2002 Tex. LEXIS 34, at *15 (Mar. 28, 2002). The Uniform Declaratory Judgments Act does not alter this standard of review. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 37.010 (West 1997); *see also Stephenson v. Leboeuf*, 16 S.W.3d 829, 842 (Tex.

3

App.CHouston [14th Dist.] 2000, pet. denied); *Oak Hills Props. v. Saga Rests., Inc.*, 940 S.W.2d 243, 244 (Tex. App.CSan Antonio 1997, no writ).

## DISCUSSION

In four points of error, Black contends that the City=s tap fee ordinance is invalid. He contends that the tap fees (i) Aare unreasonable under every standard for judging the reasonableness of tap fees@; (ii) discriminate Abetween similarly situated customers and between customer classes without a reasonable basis@; (iii) are illegal because they constitute impermissible taxation;[4] and (iv) are impermissible impact fees. In his fifth point of error, Black argues that the district court erred in denying his request for attorney=s fees. Before addressing the validity of the City=s tap fee ordinance, we discuss the home rule charter=s history to provide the context for analyzing Black=s contentions.

**Home Rule Charter**

Article XI, section 5 of the Texas Constitution authorizes cities having more than five thousand inhabitants to adopt a home rule charter. *See* Tex. Const. art. XI, ' 5. Adopted in 1912, the home rule amendment Aaltered the longstanding practice of having special charters individually granted and amended by the legislature@ for the State=s larger cities. 22 David B. Brooks, *Texas Practice: Municipal Law and Practice* ' 1.17 (2d ed. 1999). The amendment effectively created home rule cities as Amini-

---

[4] Because Black did not assert the taxation argument in the court below, he waives the issue on appeal. *See* Tex. R. App. P. 33.1(a).

legislatures.@ *See id.*  Thus, cities adopting a home rule charter Apossess the full power of self government and look to the Legislature not for grants of power, but only for limitations on their power.@ *City of Dallas*, 852 S.W.2d at 490-91.  Accordingly, absent legislation or constitutional provisions to the contrary, a home rule municipality is free to regulate itself in any manner it chooses.  In the context of this appeal, then, we look to the City=s ordinance to see, not whether the City is authorized to amend the tap fee ordinance as it did, but whether the amendment is prohibited by some constitutional or legislative restraint on the City=s authority.  *See id.*

**Reasonableness**

Black contends that, A[b]y failing to apply any accepted standard, the trial court erred@ in finding the City=s tap fees to be reasonable.  Whether a duly enacted ordinance is reasonable is a question of law.  *See City of Lucas v. North Tex. Mun. Water Dist.*, 724 S.W.2d 811, 820 (Tex. App.CDallas 1986, writ ref=d n.r.e.) (citing *Moncrief v. Tate*, 593 S.W.2d 312, 314 (Tex. 1980)).  In passing upon reasonableness, judicial review is limited to determining whether the municipality abused its discretion in passing the ordinance.  *Id.* at 820.  Because Black is challenging the validity of the fee assessment ordinance, he bears the burden of showing that it is unreasonable.  *See Comeau*, 633 S.W.2d at 792.  Repeatedly recognized by the supreme court as an Aextraordinary burden,@ a showing that a duly enacted ordinance is invalid requires Black to establish A>that no conclusive or issuable fact or condition existed= which would authorize the [City]=s passage of the ordinance.@  *Id.* at 792-93 (quoting *Thompson*, 510 S.W.2d at 581).  To be sure, this standard of review does not require the City to show that its tap fees are reasonable, but places an affirmative requirement on Black to show that they are not.

5

It is generally accepted that a regulated utility may set its rates to ensure it recoups its cost of providing utility services. *Suburban Util. Corp. v. Public Util. Comm=n*, 652 S.W.2d 358, 362 (Tex. 1983); *see also* James C. Bonbright et al., *Principles of Public Utility Rates* 1988 (2d ed. 1988) (AA fair-return or fair-profit standard of reasonable rate levels historically has been accepted with reservations throughout the United States as a controlling basis of rate regulation with respect to those privately-owned utility companies that have been granted monopoly status by federal and state governments.@). Although there are distinctions between public and private utilities, Ain so far as treatment of customers is concerned, the municipally-owned utility is not different from the privately-owned utility.@ *City of Texarkana v. Wiggins*, 246 S.W.2d 622, 625 (Tex. 1952). Recognizing this principle, the Texas Supreme Court set forth factors for judging the reasonableness of a utility=s rate structure in Texas:

> [A] proper rate determination is based upon consideration of three factors: (1) the utility=s reasonable operating expenses; (2) the rate base; and (3) a reasonable rate of return. First, there must be a determination by the regulatory authority of the utility=s reasonable operating expenses. . . . [T]he next step is the rate base calculation. After the rate base is determined, the regulatory authority determines the rate of return, or the percent of the rate base which will be recoverable in revenues by the utility.

*Suburban Util. Corp.*, 652 S.W.2d at 362 (citations omitted).[5] These principles support the proposition that in setting its tap fees the City is not limited to charging only for the direct costs associated with providing customers a connection to the water and sewer utility system. What is not clear, however, is what

---

[5] Although *Suburban Utility Corp. v. Public Utility Commission* involves a Public Utility Commission order instead of a municipal ordinance, and it relates to rates determined under the utility basis method, as opposed to the cash basis method, it is instructive for the general principle that a municipal utility cannot arbitrarily sets its rates. *See* 652 S.W.2d 358 (Tex. 1983).

additional costs the City may include in the tap fees and to what extent the inclusion of these other costs impacts the overall reasonableness of the ordinance.

Black argues on appeal that had the trial court (i) correctly applied *Davis v. Bartonville Water Supply Corp.*, 678 S.W.2d 297 (Tex. App.CFort Worth 1984, no writ), (ii) not ignored generally accepted ratemaking principles requiring fees to be based on the costs of providing services, and (iii) actually considered the magnitude of the tap fee increase and how it compared to rates charged by other similar utilities in the region, it would have found the City=s tap fees unreasonable. We address each argument in turn.

At oral argument and in his brief, Black acknowledged that *Bartonville* is not completely analogous to the case at hand. In that case, the court mistakenly employed terminology appropriate for rates developed using a utility basis method when, in actuality, Bartonville Water Supply Corporation operated on a cash basis method. *See generally id.* The parties agree that neither Arate base@ nor Arate of return@Ctwo of the three factors listed in *Bartonville*Care applicable to a utility using the cash basis method, *i.e.*, the City. Black urges us to read *Bartonville* as standing for the broad proposition that, Ato achieve fairness among customers and for economic efficiency, a utility=s rates and charges should generally reflect the cost of providing a particular service.@ We believe that Black correctly interprets that case as standing for the general, well-settled ratemaking principles that, in determining its rates, a utility must consider certain factors and its final rates must be reasonable and not unduly discriminatory. *See generally Suburban Util. Corp.*, 652 S.W.2d 358. But nothing in *Bartonville* limits the costs of providing a

7

particular service to the direct costs associated with physically connecting a customer to the City=s water and sewer systems. To the extent Black contends otherwise, we reject his interpretation of that case.

Having determined the appropriate scope of *Bartonville*, we conclude that the district court correctly applied its holding to the case at hand. In Finding of Fact No. 3, the district court found that the City Aset[] tap fees and rate revenue in an amount sufficient >to maintain and operate the [water and sewer] system[s] with due regard for anticipated needs to improve, update, construct, and maintain [those] system[s].=@ The record supports this finding. Even though the City acknowledged that its approximate cost of physically installing the water tap is $1179 and that its total tap fees exceed that amount, the district court heard and considered other evidence that would permit it to conclude the overall tap fee rate was reasonably set.

For example, City Manager Blackburn testified at trial that the City went Athrough a series of meetings . . . relating to cost analysis for tap fees, [such as] committee meetings, hearing from different staff, [and] that type of process.@ Black asserts, however, that the evidence shows Athat the challenged tap fees for multi-family dwellings were not based on the actual cost of connecting a building to the City=s water and sewer systems and setting up an account . . . .@ He further contends that the City did not perform a rate analysis until Ayears *after* the challenged tap fees had been set@ and that the eventual analysis Awas not the basis for the fees.@ Black also relies on the testimony of his expert witness, Bruce Fairchild, who concluded that the tap fees were unreasonable. Although Black asserts that the evidence he presented satisfied his burden of proof, his contention ignores the trial court=s role, as fact finder, to assess each of the witnesses= credibility and conclusions in light of all the evidence. *See Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 134

8

(Tex. 2000) (Baker, J., concurring in part, dissenting in part) ( AUnder established Texas jurisprudence, a reviewing court must defer to the fact-finder=s credibility determinations because the [fact finder] is the exclusive judge of the facts, the witnesses= credibility, and the weight given to their testimony.@) (citing *Benoit v. Wilson*, 239 S.W.2d 792, 796 (Tex. 1951)). That the trial court did not agree with Black or his expert does not mean it erred. The record includes evidence that, in addition to the City=s direct connection costs, the district court considered factors such as the City=s cost of updating, improving, and maintaining its utility system. Thus, we cannot conclude that the district court erred in applying *Bartonville*.

Black next contends that the City=s tap fees are unreasonable because they do not bear a substantial relationship to the cost involved in connecting his buildings to the utility system. It is well established that a utility=s final rate must relate to its actual cost of providing the charged-for service. *Suburban Util Corp.*, 652 S.W.2d at 362; *see also* Charles F. Phillips, Jr., *The Regulation of Public Utilities, Theory and Practice* 301 (1988) (AThere has always been general agreement that the price for the service of a public utility should be high enough to cover operating expenses, depreciation, and taxes, and also allow a fair return on the fair value of the capital invested in the business.@). Typically, a utility operating on a cash basis, like the City, classifies its costs according to its expenses associated with customer service, use, meter reading, billing, accounting and collection expenses. John Baur, *Effective Regulation of Public Utilities* 39 (1925); *see also Niles v. Chicago*, 558 N.E.2d 1324, 1332 (Ill. App. Ct. 1990) (ACash basis accounting determines basic revenue requirements by adding up operation and maintenance expense, debt service requirements, and capital expenditures that are not debt financed.@); Phillips, *supra*, at 766 (explaining revenue determined on a cash basis method includes Aoperating and

9

maintenance expenses, debt service, payment in lieu of taxes, and plant extension, replacements, and improvements@).  To meet his burden of establishing that the City=s tap fee ordinance is unreasonable based on the City=s cost of providing utility services, Black must show, not that the City=s fees exceed its actual costs of connecting his buildings to the utility system, but that the fees bear no relationship to the City=s expenses in providing him such services.

At trial, Fairchild testified that

> a fair and reasonable rate is regarded as one that approximates the cost of providing the service.  And the City has admitted that the [$]1179 is the approximate cost of installing a two-inch water meter, and the $300 is the approximate cost of installing a sewer tap, and Mr. Black in both 1998 and 2000 was charged well in excess of that cost of providing the service that he received; therefore, those are unreasonable tap fees.

This assertion erroneously defines the cost of service as merely the cost to the City of providing Black the physical connections to its water and sewer systems.  But experts for both parties acknowledged that tap fees may include the City=s direct *and indirect* costs associated with providing water and sewer connections.  Black agrees that, at a minimum, the Aservice provided to a landowner is a physical connection of the new customer to the water and sewer system [and] also includes the administrative act of setting up an account for billing and services purposes.@  Black=s evidence, however, establishes only that the City=s actual cost of physically connecting a customer to its utility system with a two-inch tap is approximately $1179; he adduced no evidence regarding the City=s indirect costs.

Instead of showing the City=s cost of service, Black attempts to satisfy his burden by arguing that the tap fees are unreasonable because the City admits to including operation and maintenance costs in

10

both its monthly rates and tap fees: "According to Fairchild, those costs should be recovered by the City through its monthly water and services charges, not through its tap fees." Black does not establish, however, that such a practice is impermissible or that the City is actually recovering more than its costs of providing Black utility services. Without showing that the City's tap fees bear no relationship to the City's cost of service as defined above, Black cannot satisfy his burden of establishing that the tap fees are unreasonable. The trial court found that the City set its tap fees "with due regard for [its] anticipated needs to improve, update, construct, and maintain the system." This conclusion is supported by the evidence.

City Manager Blackburn testified at trial and in deposition that, although the City did not perform an "independent outside cost-of-service study," it "decided to institute [the] per-living-unit fee . . . because the demands on the City water and sewer system . . . and the continuing demand for maintaining and operating the system for multi-family buildings causes a greater demand on the system." While there is ample testimony concerning *general* ratemaking principles and *speculative* City practices, there is no evidence to controvert Blackburn's testimony. Further, it is undisputed that the City may recover costs related to servicing demands. Without establishing a direct connection between the City's actual costs and assessed fees, Black could not show that the City's tap fees are unreasonable. Neither Black's nor Fairchild's conclusory statements and conjecture are sufficient to establish this link and satisfy Black's onerous burden. In the absence of evidence that the City actually assesses tap fees in excess of its total service costs, we hold that the record supports the trial court's findings that the City properly set its tap fees and that they are not unreasonable as they related to the City's cost of providing Black utility services.

11

Black=s final argument regarding the unreasonableness of the City=s tap fees asserts that the magnitude of the tap fee increase, combined with a comparison of rates charged by other similar utilities in the region, shows that the City=s tap fees are unreasonable.[6] Black testified that the tap fees for his 1998 and 2000 buildings increased over 1000% from those assessed on his three buildings built before the 1997 amendment took effect. He also explained that, based on his survey of other regions, the City=s tap fees were disproportionately high. Although this circumstantial evidence shows that the City=s tap fees are higher than other regions, such evidence is not determinative in deciding whether *the City=s* tap fees are unreasonable. *See Bartonville*, 678 S.W.2d at 300.

While we recognize that concrete evidence may be difficult to procure, we are limited by the standard of review to determining whether Black established by competent evidence that the City=s tap fees are in fact unreasonable, *i.e.*, they bear no relationship to its costs of providing utility services. Simply showing that tap fees increased and/or are greater (even if significantly so) than other regions falls far short of the proof required to prevail. Without some evidence of the City=s actual expenses for providing utility

---

[6] In his brief, Black states, AWhile these factors alone may not prove that the tap fees are unreasonable, when considered in conjunction with the analysis of the evidence [of the district court=s misapplication of *Bartonville* and the fact that the fees do not relate to the City=s cost of service], all of these factors in combination make the tap fees *per se* unreasonable.@ Having rejected Black=s arguments regarding *Bartonville* and the City=s cost of service, we analyze whether the magnitude of the increase and rate differential between other regions alone are sufficient to show the City=s tap fees are unreasonable.

service (per the standards set forth above), it necessarily follows that Black cannot carry the substantial burden of establishing the unreasonableness of tap fees. We hold that neither the evidence regarding the magnitude of the increase nor of the differential between other regions= tap fees is sufficient to establish that the City=s tap fees are unreasonable. Having rejected each of Black=s contentions regarding the reasonableness of the City=s tap fees, we overrule his first point of error.

**Impact Fee**

Black next argues that the tap fees assessed by the City constitute impermissible impact fees.[7] This is so, Black argues, because the tap fees assessed by the City exceed its cost of providing utility service, and the City uses those excess funds to expand its water and waste facilities.[8] The City acknowledged, in response to a request for admission, that the actual costs for physically connecting a building to the water tap is $1179 for a two-inch tap (the same size that services Black=s buildings). The

---

[7]   An impact fee is

a charge or assessment imposed by a political subdivision against new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development. The term includes amortized charges, lump-sum charges, capital recovery fees, contributions in aid of construction, and any other fee that functions as described by this definition.

Tex. Loc. Gov=t Code Ann. ' 395.001(4) (West Supp. 2002).

[8]   Having already addressed Black=s argument regarding the City=s cost of service in providing tap connections, we limit our discussion here to determining only whether the City uses tap fee revenues to fund new development.

City asserts, however, that because it does not use any funds collected as tap fees to fund new development, its tap fees are not impact fees.

An ordinance assessing impact fees is invalid unless it complies with the procedures outlined in Texas Local Government Code chapter 395. *See* Tex. Loc. Gov=t Code Ann. '' 395.011-.013, .041-.058 (West 1999 & Supp. 2002). A fee is not an impact fee merely because it is greater than the actual cost associated with the service for which it is assessed. *See Bartonville*, 678 S.W.2d at 299. Instead, the fee must impose upon a new development the burden of generating Arevenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development.@ Tex. Loc. Gov=t Code Ann. ' 395.001(4) (West Supp. 2002). Thus, to prevail Black must establish that the City uses revenue generated from its tap fees to fund expansion of the utility service to serve new development.

Black=s expert witness testified at trial regarding his opinion about whether the challenged tap fees are effectively impact fees. Fairchild stated:

> It=s my opinion that the $300 fee for each additional water connection and the $300 fee for each additional sewer connection, both of which are charged based on the number of living units, not on the number of taps, are effectively impact fees. That even though they=re called tap fees they have all the characteristics of an impact fee because they are essentially assessed above the costs of providing the tap and they are on a living unit equivalent basis which is how impact fees are typically assessed.

Explaining further, Fairchild testified:

> Well, there=s two other items that suggest that they are more akin to impact fees than they are to tap fees. One of those is when they are assessed . . . . [T]ap fees are normally

15

assessed at the time the tap is actually made; whereas impact fees are . . . more often [assessed] early in the process, either at when you get a building permit or something prior to actual installation. Secondly, the history . . . of where the earlier ordinance adopting this set of tap fees had the moneys from tap fees specifically designated to go into an extension fund or a fund that was intended to finance extensions of the Killeen water and sewer system.

Fairchild further testified that his conclusion—that the City=s tap fees are impact fees—found support from the fact that various annual budgets and records of municipal services provided Aevidence that revenue from the tap fees [was] being used by the City to . . . pay for capital improvements and facility expansions.@ Fairchild=s principle support for this argument came from the fact, Athat Water and Sewer Tapped Revenues are included in the total revenues of the system. In other words, they=re deposited in the Water and Sewer Fund. And out of that same fund . . . capital improvement projects are also funded from the Water and Sewer Fund.@

Fairchild=s testimony distills into the following arguments: the tap fees are in actuality impact fees because (i) they are assessed above the cost of providing the tap connection, (ii) they are assessed before the tap is actually made, (iii) earlier versions of the ordinance required the tap fee revenues to be deposited in an account designated to fund extensions of the City=s water and sewer system, and (iv) the revenue derived from the tap fees is currently deposited into a general Water and Sewer Fund which also funds capital improvement projects (new development extensions). The City contends that a fee is not an impact fee unless it generates revenue for funding or recouping the costs of new development. *See* Tex. Loc. Gov=t Code Ann. ' 395.001(4). At trial, Fairchild defined impact fees as Adollars to be used for capital improvements.@ It appears that the parties agree, as do we, that unless the revenues generated from

16

tap fees are actually used for capital improvements, they are not impact fees. The dispositive inquiry, then, concerns how the fees are ultimately used, as opposed to how or when they are calculated or collected. For this reason, only Fairchild=s last two arguments are relevant to our determination of whether the City=s tap fees are impact fees.

The trial court determined that the City Auses the revenue generated by water and sewer tap fees >to maintain and operate the system with due regard for anticipated needs to improve, update, construct, and maintain the [utility] system.=@ Although Black and Fairchild argue that the City=s actions prior to the 1997 amendment to the tap fee ordinance are evidence of its intent to raise revenue for the expansion of the utility infrastructure made necessary by new development, they offer no evidence of how the tap fees were spent during the relevant time period. We acknowledge the difficulty of tracing the tap fees after they are deposited in the general Water and Sewer Fund, but we cannot relieve Black of his burden of showing that funds are actually being used to pay for expansion due to new development. Further, this burden cannot be satisfied by reference to the City=s *past* practices; nor is it sufficient for Black to allege that the Arecord includes evidence that the City *may* use tap fee revenue to pay for capital improvements and facility expansion.@ (Emphasis added.)

At trial, Black made no attempt to show directly how the City funded facility expansion. The City=s Director of Finance, Connie Green, testified in deposition that A[t]he City uses a consolidated cash account [so that] . . . transactions that affect each individual fund are accounted for separately . . . and can be easily identified.@ Green further stated that: generally all City appropriations are made in the budget; a project funded during the budgeting process will receive a number code; each department submits

17

payment requisitions with the predetermined code; and the finance department, using the predetermined codes, processes the transactions and charges them to the appropriate departments. Neither party called Green as a witness at trial. Despite the apparent availability of City records concerning facility expansion costs, Black failed to establish the City=s actual practice of funding new development. City Manager Blackburn=s testimony regarding the general practice of the City=s funding new development is alone insufficient to establish that the City uses tap fee funds for new development expansion.[9]

Because the record contains no analysis of the City=s *total* costs of providing service or the source of funding for new development expansion, we cannot disagree with the trial court=s finding of fact that the City Adoes not use tap fees to fund the costs of capital improvements or facility expansion necessitated by and attributable to new development.@ Accordingly, we hold that Black failed to meet his burden of establishing that the City=s tap fees are impermissible impact fees. We overrule his fourth point of error.

**Price Discrimination**

---

[9]    Black adduced testimony from Blackburn that capital improvements and facility expansion are paid for by issuing revenue bonds and that the City does not pay those expenses from its operating account. Black=s expert testified that this practiceCdepositing revenues generated from the City=s tap fees into the general Water and Sewer FundCis typical of municipalities.

Black next contends that the City=s tap fees are discriminatory Abecause they do not relate to the level of service provided to each@ multi-family building. This is so, according to Black, because Aeven though the tap fee is applied uniformly across the multi-family customer class, relative to the service that [is] provided, one customer pays more for the same service than another customer.@ At the outset, we recognize that not all price discrimination is condemned, but only Adiscrimination that is arbitrary and without a reasonable fact basis or justification.@ *Caldwell v. City of Abilene*, 260 S.W.2d 712, 715 (Tex. Civ. App.CEastland 1953, writ ref=d); *see also Wiggins*, 246 S.W.2d at 624 (stating that a utility service Amay not discriminate in charges or service as between persons similarly situated . . . unless there is some reasonable basis for a differentiation@); *City of Galveston v. Kenner*, 240 S.W. 894, 895 (Tex. 1922) (explaining that utility Aservice must be given without discrimination between persons similarly situated or under circumstances substantially the same@). To be sure, public utilities are under a legal duty to charge reasonable rates and ensure that they are not unduly discriminatory.[10] James C. Bonbright et al., *Principles of Public Utility Rates* 515 (2d ed. 1998). It is well established, however, that municipalities have the right to classify customers Abased upon such factors as the cost of service, the purpose for which the service or

---

[10] Price discrimination is assessed against a two-pronged test: (i) reasonableness of rates and (ii) whether the rates are unduly discriminatory. James C. Bonbright et al., *Principles of Public Utility Rates* 515 (2d ed. 1998). Discrimination Aoccurs when a seller establishes for the same product or service different rates which are not entirely justified by differences in cost, or the same rate where difference in cost would justify differences in price.@ Charles F. Phillips, Jr., *The Regulation of Public Utilities, Theory and Practice* 62 (1988). The two bases for price differentiation are Acost of service@ and Avalue of service.@ *Id.* at 411. When rates are based upon demand, impermissible discrimination occurs; however, A[a] seller does not [unduly] discriminate when rates are based upon costs, even though some customers pay more than others.@ *Id.* at 411. Price discrimination is permitted because it may be more expensive to serve some customers than others. *Id.* at 411-12. Accordingly, we recognize that discrimination may reflect policy considerations on the part of the utility to limit the demands of certain customers on its resources.

19

product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction.@ *Gillam v. City of Fort Worth*, 287 S.W.2d 494, 497 (Tex. Civ. App.CFort Worth 1956, writ ref=d n.r.e.). But in classifying its customers, municipalities Amay not discriminate in charges or services as between those similarly situated.@ *Wiggins*, 246 S.W.2d at 625. No rule of thumb exists for determining whether customers are similarly situated. *Ford v. Rio Grande Valley Gas Co.*, 174 S.W.2d 479, 480 (Tex. 1943). The question of discrimination is one of fact and must be decided on a case-by-case basis, recognizing that

> [w]hether differences in rates between classes of customers are to be made, and, if so, the amount of the differences, are legislative rather than judicial questions, and are for the determination of the governing bodies of the municipalities. The presumption is in favor of the legality of the rates established by the rate-making authority, and courts may interfere only in clear cases of illegality.

*Gillam*, 287 S.W.2d at 497. The burden of proof remains at all times upon the party claiming a fee is unreasonably discriminatory.[11] *Caldwell*, 260 S.W.2d at 714; *Ford*, 174 S.W.2d at 480.

---

[11] In arguing that he should prevail because the City Afailed to meet its burden of showing that [its] discrimination was reasonable and justified[,]@ Black improperly assigns *his* burden to the City. Black=s assertion Athat the record is completely devoid of any evidence . . . that the City considered [any] factors in calculating [its] rates and establishing the tap fee methodology for multi-family tap fees@ also confuses the

20

burden of proof. The burden to establish that the tap fees are unduly discriminatory rests with Black and cannot be satisfied by reference to what evidence the City failed to produce. *See Ford v. Rio Grande Valley Gas Co.*, 174 S.W.2d 479, 480 (Tex. 1943).

Black argues that the tap fees are discriminatory because only multi-family customer tap fee charges include operating and maintenance expenses for the entire utility system; thus, Atap fees for single family dwellings recover only the approximate cost of making the connection, while the tap fees for multi-family dwellings are far in excess of the cost of installation of the tap.@ The City=s position is that per living unit assessments are permissible and nondiscriminatory. The City argues that Black=s contentions do not take into account that Ait would be nearly impossible to devise a system that perfectly correlated rates assessed to the number of persons using the system@ and that the City, Ain its discretion, has determined that assessing tap fees on a per >living unit= basis reasonably recognizes costs associated with [the] increased demand@ that multi-family buildings place on the system. We agree with the statement of our sister court in a similar case involving a challenge to an ordinance requiring some water customers to pay higher rates than others: AThe interest and needs of the numerous water users served by a city are such that it is improbable, if not impossible, that any classification or rate basis could be devised which would not in some way discriminate against some users.@ *Caldwell*, 260 S.W.2d at 715.

The City was well within its authority to set its tap fees. It was Black=s burden to show that the City=s tap fee structure assessed different rates for different classes of customers and that such a Adistinction [was] not justified by the difference in factors properly@ considered by the City in establishing the rate structure. *Gillam*, 287 S.W.2d at 497. Black asserts that, because the City=s monthly water rates account for operations and maintenance costs, the City cannot also include those costs in assessing its tap fees. The City ordinance assesses tap fees based upon one of five classifications: (i) residence (one connection charge); (ii) multi-family (one connection charge for each living unit); (iii) commercial (one

22

connection charge for each certificate of occupancy issued or meter, whichever is greater); (iv) industrial (as authorized by city council); and (v) mobile home park and manufactured home subdivisions (one connection charge for each living unit). Killeen, Tex., Code of Ordinances ' 30-102(b). On its face, the ordinance permits the City to assess each occupant of a building a connection charge; that there are more occupants in multi-family dwellings and commercial properties does not make the tap fee structure per se discriminatory. Black points to no evidence in the record to support his position that the City is prohibited from recouping a portion of its operation and maintenance costs through its tap fees. Thus, on the record before us, we cannot say the trial court erred in finding that Black failed to establish that the City=s tap fees are *unduly* discriminatory, that is, that the City=s reasons for discriminating were not justified by reasonable bases. Accordingly, we overrule Black=s second issue.

**Attorney=s Fees**

Black=s fifth point of error challenges the trial court=s denial of his request for attorney=s fees. Under the Uniform Declaratory Judgments Act, a trial court may award attorney=s fees Aas are equitable and just.@ Tex. Civ. Prac. & Rem. Code Ann. ' 37.009 (West Supp. 2002); *Brainard v. State*, 12 S.W.3d 6, 27 (Tex. 1999). When a trial court denies claims for attorney=s fees under the Act, its decision is reviewed for an abuse of discretion. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). Whether a party prevails in a declaratory judgment action is not a determining factor in awarding attorney=s fees. *See Commissioners Court v. Agan*, 940 S.W.2d 77, 82 (Tex. 1997); *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996). Because Black presents

23

no evidence on appeal that the trial court abused its discretion, we overrule his fifth point of error and affirm the trial court=s judgment denying his request for attorney=s fees.

## CONCLUSION

Black failed to establish that the City=s tap fees are unreasonable because there is no evidence that such fees are in excess of the City=s cost of providing utility services. Further, without proof of the City=s actual expenditures, Black failed to show that the City impermissibly uses tap fees to fund new development and is thus an impact fee. Finally, because Black did not establish that the City lacks a reasonable basis to classify customers differently, he also failed to establish that the tap fees are discriminatory. Black did not carry his substantial burden of establishing that the City=s tap fee ordinance is invalid. Thus, we cannot say that the trial court=s judgment in the City=s favor is incorrect. Accordingly, we overrule Black=s five points of error and affirm the trial court=s judgment.


Jan P. Patterson, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   May 31, 2002

Publish

24