

NUMBER 13-10-00446-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

TRANSTEXAS GAS CORP., N/K/A
SANDRIDGE ONSHORE, LLC,                                          Appellant,

v.

FORCENERGY ONSHORE, INC.,                                          Appellee.

### On appeal from the 329th District Court
### of Wharton County, Texas.

# MEMORANDUM OPINION

**Before Justices Garza, Benavides, and Vela**
**Memorandum Opinion by Justice Vela**

This is an appeal from a judgment in a non-jury case granting declaratory relief and

attorney's fees in favor of Forcenergy Onshore, Inc. ("Forcenergy"). Appellant,

TransTexas Gas Corp. n/k/a SandRidge Onshore LLC ("TransTexas"), raises nine issues

on appeal, complaining that the trial court erred in re-adjudicating its title in the relevant oil and gas leasehold estate because title was adjudicated in a prior suit between the same parties. TransTexas also urges that the trial court erred by: (1) declaring that Forcenergy owns fee simple determinable and TransTexas owns the possibility of a reverter; (2) declaring that the title to TransTexas's working interest is reduced by the operation of the non-consent provision set forth in a September 1982 joint operating agreement; (3) concluding that Forcenergy prevailed in the prior litigation between the parties in connection with the issue of the application of the joint operating agreements to TransTexas; (4) concluding that TransTexas did not preserve the issue of the application of the joint operating agreements to TransTexas in the appeal of the prior case between the parties; (5) declaring that the September 1982 joint operating agreement acted to convey title from TransTexas to Forcenergy to the "fee simple determinable" in all of TransTexas's working interest; (6) declaring that Forcenergy could enforce the September 1982 joint operating agreement against TransTexas despite the fact that the joint operating agreement was an executory contract rejected in TransTexas's bankruptcy; (7) failing to award TransTexas the relief it requested; and (8) awarding Forcenergy attorney's fees. We affirm.

## I. BACKGROUND

### A. Stipulated Evidence

This is a suit between two oil and gas companies involving contract claims. The claims involve the rights of the parties with respect to an oil and gas lease called the Krueger Lease. The parties entered into a lengthy stipulation of facts in the trial court.

2

Among the stipulated facts was an agreement that TransTexas and Forcenergy's leasehold interests in the Krueger Lease are held under chains of title that originated from Nasco, Ltd. ("Nasco") and Kimbark Oil and Gas Company Ltd. ("Kimbark"). Thereafter, Kimbark, Roy H. Dubitzky & Associates ("Dubitzky") and Nasco as non-operators, and Forney Oil Corporation ("Forney") as operator, who collectively owned 100% of the leasehold interest in the Krueger Lease, entered into a letter agreement dated September 22, 1982, and a joint operating agreement, which covered all of the leasehold interest in the Krueger Lease. Subsequently, Nasco made assignments of its retained 12.5% leasehold interest and Kimbark's 87.5% leasehold interest, which were made expressly subject to the September 1982 joint operating agreement and the assignments were filed in the real property records.

The parties disagree with respect to whether they obtained their respective interests in the Krueger Lease subject to a September 1982 joint operating agreement. But, they agreed that Forney and others as non-operators, and Bill Forney, Inc., as operator, entered into a joint operating agreement, dated October 8, 1982, which covered their interests in the Krueger Lease. At issue here is the applicability of the non-consent provision of the September 1982 joint operating agreement providing that upon drilling, reworking, deepening or plugging any well, that each non-consenting party "shall be deemed to have relinquished to Consenting parties all of such Non-Consenting Party's share of the costs of any new surface equipment and operation of the well, and (b) up to 300% of the Non-Consenting party's share of the costs and expenses of drilling and new equipment in the well, subject to deductions."

3

In 1984, the majority of the working interest owners in the Deep Rights[1] conveyed their interests to Conoco, Inc. ("Conoco"). However, Arrington and Dubitzky did not. Forcenergy's working interest in the Deep Rights derives from two assignments conveyed by Arrington and Dubitzky in 1986, which collectively conveyed 2.8125% of the working interest. Arrington and Dubitzky obtained their respective interests in the Krueger Lease expressly subject to the September 1982 joint operating agreement. Arrington and Dubitzky assigned part of their remaining working interest in the Deep Rights to TransTexas, being .9375%, conveyed in 1998.

In the first case that came before this Court, Forcenergy challenged TransTexas's ownership rights in a portion of the Deep Rights to the Krueger Lease, claiming that those rights were never obtained by Conoco and TransTexas as an assignee of Conoco. *TransTexas Gas Corp. v. Forcenergy Onshore, Inc.*, 13-02-387-CV, 2004 WL 1901717, at *1 (Tex. App.—Corpus Christi Aug. 26, 2004, pet. denied) (mem. op.) (*TransTexas I*). During the pendency of the initial case, Forcenergy sent drilling proposals to TransTexas, seeking consent to its proposed drilling in the Deep Rights, including wells known as the Krueger 8, 9, 10 and 12. *Id.* at *1. TransTexas does not contest that the four drilling proposals contained all of the information required to be furnished under the September joint operating agreement, but contests that the September joint operating agreement applies to it.

TransTexas responded to Forcenergy's drilling proposals by stating that it did not believe that the proposals were proper and TransTexas did not consent. TransTexas

[1] The parties have referred to the zone below 8,500 feet as the "Deep Rights", and the zone above that depth as the "Shallow Rights".

4

contends it is not to be bound by the September and October joint operating agreement and its interests in the Krueger Lease are not subject to those agreements. Forcenergy counters that TransTexas's interest in the Krueger Lease is subject to the September joint operating agreement and it is entitled to the non-consent recoveries provided in the joint operating agreement.

In November 2002 the Krueger wells were completed. TransTexas filed bankruptcy under Chapter 11 of the Bankruptcy Code. Forcenergy filed a proof of claim in January 2003.

The parties agreed that the initial case was severed from this one by order dated April 2, 2002. In *TransTexas I*, the trial court ruled in favor of Forcenergy on issues relating to the Krueger Lease. This Court reversed and ruled primarily in favor of TransTexas, which now urges that our original opinion included a finding that the September and October joint operating agreements are inapplicable to it. Forcenergy contends that this Court found that the joint operating agreements were applicable to TransTexas, but acknowledges that this Court's opinion determined that Forcenergy was not the operator. Forcenergy argues that the September joint operating agreement applied to TransTexas and that Forcenergy, as the owner of what it contends are relinquished interests, can retain the revenues otherwise due to TransTexas until production revenues are sufficient to apply the contracted non-consent penalty.

## B. Prior Opinion

Because TransTexas's initial arguments concern res judicata, we begin our analysis with a synopsis of our original opinion that TransTexas claims is the basis for its

5

res judicata claim. *See id.* At issue in our earlier opinion was title to the deep mineral rights that were the subject of a letter exchange agreement issued in 1984. *Id.* at *1. Forcenergy filed suit to remove the cloud on its title to the deep mineral rights; TransTexas counterclaimed for slander of title and sought a declaratory judgment that TransTexas held title to the Deep Rights and that Forcenergy was not the operator with respect to the Deep Rights. *Id.* at *3. Based on motions for summary judgment filed by both parties, the trial court denied TransTexas's claim that Forcenergy was not the operator of the Deep Rights and declared that Forcenergy held good, superior and equitable title to the Deep Rights. *Id.* at *9. Ultimately, this Court held that TransTexas holds the title to the deep mineral rights that were the subject of the parties' letter exchange agreement of September 18, 1984. *Id.* This Court also reversed the trial court's declaration that Forcenergy was the operator of the deep mineral rights that were the subject of the parties' letter exchange agreement. *Id.* The Court then rendered judgment that Forcenergy was not the operator of the deep mineral rights.

There is no dispute that the earlier case included Forcenergy's claim to quiet title and TransTexas's counterclaim asserting that it owned the title that Forcenergy claimed. Those claims are not at issue in this case. This Court determined that TransTexas owned all of the title conveyed to it, which was 97.1875% of the working interest in the Deep Rights of the Krueger Lease.

Forcenergy's argument here is that TransTexas did not consent to Forcenergy's drilling and, by not consenting, triggered the non-consent provision of the September 1982 joint operating agreement. Forcenergy contends that its claims are not barred by

6

res judicata because they were previously severed from the original action. Forcenergy also argues that it would have made no sense for it to have asserted its non-consent claims in the first case because its non-consent claim did not arise from the same subject matter as the ownership issues decided in the earlier case. Forcenergy urges that it is not seeking to re-litigate or change this Court's previous adjudication of title.

## II. STANDARD OF REVIEW

When a trial court enters a declaratory judgment after a bench trial, the court of appeals applies a sufficiency standard to review the findings of fact and reviews the trial court's conclusions de novo. *See Black v. City of Killeen*, 78 S.W.3d 686, 691 (Tex. App.—Austin 2002, pet. denied). A trial court's conclusions of law may be reversed only if they are erroneous as a matter of law. *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 748 (Tex. App.—Corpus Christi 2006, pet. denied); *see also Ramirez v. Calhoun County*, 13-09-00018-CV, 2009 WL 5135632, at *4 (Tex. App.—Corpus Christi Dec. 29, 2009, no pet.) (mem. op.).

In analyzing the legal sufficiency of the evidence that supports a finding, we review the record in the light most favorable to the findings, and indulge every reasonable inference that supports it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

## III. RES JUDICATA

Res judicata precludes the re-litigation of a finally adjudicated claim and related matters that should have been litigated in a prior suit. *State & County Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d 693, 696 (Tex. 2001) (*citing Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992)). The doctrine bars matters actually litigated and causes of

action or defenses that arise out of the same subject matter and that could have been litigated in the first suit. *Barr*, 837 S.W.2d at 630. "[A] claimant generally cannot pursue one remedy to an unfavorable conclusion and then pursue the same remedy in another proceeding before the same or a different tribunal." *Igal v. Brightstar Info. Tech. Group, Inc.*, 250 S.W.3d 78, 86 (Tex. 2007).

Texas follows the transactional approach to res judicata, which requires that a defendant bring, as a counterclaim, any claim arising out of the transaction or occurrence that is the subject matter of the opposing party's suit. *Miller,* 52 S.W.3d at 696. For res judicata to apply, these elements must be present: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) the same parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Igal*, 250 S.W.3d at 86.

TransTexas argues that the issue before the trial Court and this Court either was or could have been brought in the prior action. First, it argues that the pleadings in both cases show that the claim arises out of the same transaction. Specifically, TransTexas claims that the transaction in the initial case included Forcenergy's attempt to apply the joint operating agreements and interests in the four wells that it drilled. It further argues that the transaction in the present case includes Forcenergy's attempt to apply the joint operating agreements in connection with the revenues and interest from the four wells that it drilled.

Forcenergy counters primarily with the argument that its counterclaim to apply the non-consent provision of the joint operating agreement does not arise out of the same

transaction. It argues that its non-consent claim arises from TransTexas's election not to participate in well proposals sent by Forcenergy to TransTexas beginning in May 2001.

Generally, the parties to an oil and gas operating agreement have the option to share operating costs and liabilities. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 659 (Tex. 2005). The participants are called consenting parties. *Id.* Those parties who elect not to participate are called non-consenting parties and are subject to a non-consenting penalty, which operates as a temporary relinquishment of the interest owners have of the production revenue to the consenting parties. *Id.* After the investments of the consenting parties are recouped, the non-consenting parties share in the production revenues in proportion to their ownership interests. *Id.*

The ownership issues discussed in the initial case arose out of an exchange agreement in 1984. The issues in the first case, with respect to the joint operating agreements, arose from the operator provisions of those agreements. The non-consent claims arose out of acts occurring later in time and involved a totally different provision of the joint operating agreement. The first case dealt with the operator provisions of the joint operating agreement, while the second deals with the non-consent agreement that was part of the joint operating agreement. In the first case, Forcenergy was claiming ownership interest. In this case, Forcenergy is asserting non-consent claims. It would not have been feasible for Forcenergy to be required to assert non-consent issues in the initial case because it was attempting to establish its own ownership interest in that case. The non-consent claims became justiciable only after this Court determined in the initial case that TransTexas owned the disputed interests. Thus, we agree with Forcenergy

9

and conclude that the case is not barred by res judicata. TransTexas's first issue is overruled.

#### IV. APPLICATION OF THE NON CONSENT PROVISION

By issues two through seven, TransTexas argues that the non-consent agreement is not applicable because the joint operating agreements were amended by a transaction occurring in 1984 between Conoco and Forney.

In 1984, Conoco and Forney agreed to exchange certain mineral interests. Forney assigned Conoco the working interest in the Deep Rights in the Krueger leases and Conoco assigned Forney its Shallow Rights interests in other leases in the field. Forcenergy's current working interest in the Deep Rights in the Krueger Lease, however, derives from assignments made by Arrington and Dubitzky in 1986, conveying 2.8125% of the working interest expressly subject to the September joint operating agreement. Arrington and Dubitzky assigned part of their remaining interest in the Deep Rights to TransTexas in 1998. The above assignments mention the September joint operating agreement and the assignments were recorded in the real property records.

TransTexas urges that the language of the 1984 transactional documents, and the conduct of the parties with respect to the transaction, showed that they intended that the joint operating agreements would no longer apply to the Deep Rights and were amended. TransTexas further urged that the non-consent agreement does not apply because TransTexas did not assume the obligations in the 1984 transaction and the obligations did not run with the land.

10

Forcenergy counters by stating that TransTexas judicially admitted that its interest in the Deep Rights is governed by the joint operating agreement. Forcenergy argues that the fact that TransTexas did not sign the joint operating agreements is immaterial because the non-consent provisions run with the land. The evidence Forcenergy points to as support is an affidavit by Clay Fisher, TransTexas's landman, who swore in an affidavit that the Krueger Lease was covered by the September 1982 joint operating agreement. There was also evidence of record that TransTexas sought and obtained an ex-parte temporary restraining order based upon the applicability of the joint operating agreements to the Krueger Lease. In reviewing our initial opinion, we discussed language from the September joint operating agreement. We also stated: "Further, the operating agreement at issue provided that if Forcenergy 'no longer owns an interest' in the deep mineral rights, 'it shall cease to be Operator without any action by Non Operator.'" *TransTexas,* 2004 WL 1901717, at *9. This Court ultimately concluded that the trial court should have concluded that Forcenergy was not the operator of the deep mineral rights. *Id.* In the motion for summary judgment in the initial case, TransTexas pleaded that the Krueger leases were covered by the joint operating agreements. Additionally, TransTexas sought an adjudication that Forcenergy was not the operator in a motion for temporary restraining order.

With respect to TransTexas's argument that it never signed the joint operating agreements and they were amended, in *Westland Oil Development Corp. v. Gulf Oil Corp.*, the supreme court noted that every purchaser is bound by every "recital, reference, and reservation contained in or fairly disclosed by any instrument which forms an

11

essential link in the chain of title under which he claims." 637 S.W.2d 903, 908 (Tex. 1982); *see also Hi-Mountain Energy Corp. v. Avra Oil Co.*, Cause No. 08-00-00243-CV, 2002 WL 660891, at *4 (Tex. App.—El Paso 2002, pet denied) (holding that parties were bound by unrecorded joint operating agreements referenced in their chain of title). TransTexas admitted that it had constructive notice of the joint operating agreements because of assignments to Conoco that referenced the joint operating agreements. An operating agreement is typically in effect for as long as any of the oil and gas leases subject to the joint operating agreement remain in effect. *See* ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 17.3 (A)(1) (2009).

TransTexas argues, however, that joint operating agreements can be amended by the actions of the parties and it urges that by agreeing to the assignment to Conoco and the letter exchange agreement in 1984, the parties did not intend for the joint operating agreement to apply. It is undisputed that the 1984 agreements did not refer to the joint operating agreements. However, Arrington and Dubitzky, who were parties to the September joint operating agreement, did not join in the Forney assignment or the letter agreement and did not separately convey their rights. They continued to own a 3.75% leasehold working interest in the Krueger Lease. After the Forney assignment and letter exchange agreement, Arrington and Dubitzky assigned all of their leasehold working interest to Great Western Resources, except for 25% of that interest to depths below 10,000 feet. In 1986, Dubitzky and Arrington conveyed 75% of their Deep Rights to Forcenergy, and in 2000 the remaining Deep Rights to TransTexas. Because TransTexas sought and obtained injunctive relief based upon the joint operating

12

agreements, admitted that the joint operating agreements covered the Krueger Lease, and sought an adjudication that Forcenergy was not the operator, we agree with Forcenergy that the September joint operating agreement applies here.

We must also determine, however, if the joint operating agreement "runs with the land" so that the successors in interest are bound. Under *Westland*, the parties must intend to create a covenant running with the land in order to effectuate a covenant. In *PYR Energy Corporation v. Samson Resources Co.*, the court held that there was nothing in a deed to indicate that that joint operating agreement would be binding upon all successors in interest or that the joint operating agreement provisions were covenants running with the land. *See* 470 F. Supp. 2d 709, 719 (E.D. Tex. 2007). Here, the September 1982 joint operating agreement provided that it was to be "binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, representatives, successors and assigns." This demonstrated that the covenants in the joint operating agreement run with the land. *See Westland*, 637 S.W.2d at 910–11. We hold, therefore that the trial court did not err in determining that the joint operating agreement applied. We overrule issues two through seven.

By its eighth issue, TransTexas argued that its bankruptcy deprived Forcenergy of its property rights. The trial court found that TransTexas's rejection of the joint operating agreements in bankruptcy had no effect on Forcenergy's ownership of relinquished interests because the relinquished interests are excluded under section 541(b)(4) of the federal bankruptcy code, which provides:

13

(b) Property of the estate does not include—

(4) any interest of the debtor in liquid or gaseous hydrocarbons to the extent that—

> (A)(i) the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and
>
> (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3) of this title; or
>
> (B)(i) the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred; and
>
> (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of this title;

11 U.S.C.A. § 541 (West 2011).

The statute also defines the term "farmout" to mean:

> (21A) The term "farmout agreement" means a written agreement in which—
>
> (A) the owner of a right to drill, produce, or operate liquid or gaseous hydrocarbons on property agrees or has agreed to transfer or assign all or a part of such right to another entity; and
>
> (B) such other entity (either directly or through its agents or its assigns), as consideration, agrees to perform drilling, reworking, recompleting, testing, or similar or related operations, to develop or produce liquid or gaseous hydrocarbons on the property.

The statute which defines the term "farmout," has been interpreted more broadly than is typical in the oil and gas industry. *See* (R. Campbell & D. Bennett, Energy) *Bankruptcy in the New Millenium: Energy, Insolvency and Enron,* 48 Rocky Mtn. Min. L. Inst. 18, 19 (2002). The definition of farmout requires that there be a written agreement in which the

owner of a right to drill, produce, or operate liquid or gaseous hydrocarbons on property agrees to transfer or assign an oil and gas interest that includes, as consideration, defined operations upon the property. The interests transferred under such an agreement will not be property of the estate under section 541(b)(4)(A).

Under article VI, section B.2 of the September 1982 joint operating agreement, TransTexas agreed to transfer its rights to the wells and production to the consenting parties (including Forcenergy), and Forcenergy agreed to drill wells to produce liquid or gaseous hydrocarbons. These provisions are contained in the September 1982 joint operating agreement, which is in TransTexas's chain of title. TransTexas's title was subject to the terms and provisions of the September 1982 joint operating agreement. Thus, the trial court correctly concluded that the September 1982 joint operating agreement is a "farmout agreement" under section 101 (21A). 11 U.S.C.A. § 101 (West Supp. 2011). Any oil and gas interests that TransTexas claimed to include in the bankruptcy were excluded from TransTexas's bankruptcy estate. Because the relinquished interests were not a part of the bankruptcy, the relinquished interests remained owned by Forcenergy. Further, the bankruptcy agreed orders provided that they would not affect or prejudice the rights, claims, allegations that the parties have asserted or may hereafter assert in litigation pending in the 329th District Court in Wharton County. We overrule issue eight.

By issues nine and ten, TransTexas argues that the trial court erred in failing to award it damages and awarding Forcenergy attorney's fees pursuant to section 37.009 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §

15

37.009 (West 2008). TransTexas argued that because it should prevail on the merits, it should be awarded damages. We have previously held that the trial court's rulings in favor of Forcenergy should stand. Thus, TransTexas is not entitled to damages. We also hold that the trial court had discretion to award attorney's fees to Forcenergy. *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). The parties stipulated that $260,000 was reasonable and necessary. We overrule issues nine and ten.

## V. CONCLUSION

We affirm the judgment of the trial court in favor of Forcenergy.


ROSE VELA
Justice

Delivered and filed the
12th day of April, 2012.

16